**BAPTIST MEMORIAL HOSPITAL SYSTEM, Appellant,**

v.

**Pleas R. SMITH, as Guardian of the Person and Estate of Evan W. Smith, Jr., Mentally Incompetent, Appellee.**

No. 04–89–00582–CV.

Court of Appeals of Texas, San Antonio.

Aug. 21, 1991.

Rehearing Denied Aug. 21, 1991.

Second Rehearing Denied Dec. 20, 1991.

Ruth Greenfield Malinas, Ball and Weed, Thomas H. Crofts, Jr., Jo Reser, Groce, Locke & Hebdon, San Antonio, for appellant.

Andrew L. Todesco, Kevin DuBose, Jim M. Perdue, Mark D. Clore, Perdue & Todesco, Houston, for appellee.

Before CADENA, C.J.,[1] and CHAPA and CARR, JJ.

## ON APPELLANT'S MOTION FOR REHEARING

CHAPA, Justice.

Appellant's motion for rehearing is denied; our opinion of March 28, 1991 is withdrawn and this opinion is substituted therefor.

This is a medical malpractice case, which arose from an incident which occurred on June 22, 1980, in the emergency room of the Northeast Baptist Hospital, one of several health care facilities comprising the Baptist Memorial Hospital System. Evan W. Smith, Jr., then a fifty-five-year-old telephone company lineman, presented himself in the hospital's emergency room where he sought treatment from a physician on duty for a sore throat and difficulty in swallowing. He experienced severe spasms and cardio-respiratory arrest after the administration of penicillin and bicillin for the treatment of acute inflammation or infection of the throat. As a result of the treatment he received in the hospital emergency room, Smith was without oxygen for approximately five minutes, causing permanent and irreversible brain damage.

Smith, through his guardian Pleas R. Smith [hereinafter Smith], brought suit against the emergency room physician, Dr. Harry Henderson; Emergency Physicians Affiliates [EPA], the professional association with which Dr. Henderson was affiliated; and Baptist Memorial Hospital System [BMHS], owner and operator of the hospital emergency room. In his lawsuit, Smith contended that Dr. Henderson should have diagnosed epiglottitis and intubated Evan Smith to prevent respiratory failure, and that a tracheostomy was not properly performed on the patient. At the conclusion of presenting Smith's case, his counsel dismissed EPA as a defendant in the lawsuit, and the case proceeded against the two remaining defendants. Dr. Henderson presented evidence in his defense, and BMHS rested without presenting any evidence. The case was then submitted to the jury, which found that Dr. Henderson was negligent and that he was the ostensible agent of BMHS, and that BMHS should be estopped from denying that Dr. Henderson was its agent. In so finding, the jury rendered a verdict in Smith's favor against both defendants on the following elements of damages:

| | |
|---|---|
| Past pain and anguish | $1,000,000 |
| Future pain and anguish | $1,000,000 |
| Lost wages in the past | $ 150,000 |
| Loss of future earning capacity | $ 200,000 |
| Disfigurement in the past | $ 500,000 |
| Future disfigurement | $1,000,000 |
| Physical impairment in the past | $2,000,000 |
| Future physical impairment | $2,000,000 |
| Past medical and related expenses | $ 300,000 [2] |
| Future medical and related expenses | $3,000,000 [3] |

---

1. Carlos C. Cadena, Chief Justice (retired), not participating.

2. The evidence demonstrated only $165,406.27 in past medical expenses. As a result, Smith voluntarily remitted $134,694.73, and agreed that the trial court should render judgment for $165,406.27, rather than the amount found by the jury on this element of damages.

3. Smith agreed to a remittitur of $1,675,488 of this element of damages, leaving $1,324,512 of the award intact, which BMHS contends is still excessive.

Only BMHS appeals from this adverse judgment.

In eight points of error, BMHS urges trial court error in the following particulars:

(1) The evidence is legally insufficient to support the jury's answer concerning "agency relationship A," in that:

(a) there is no evidence that BMHS represented that Dr. Henderson was its employee;

(b) there is no evidence that it was BMHS's representation of employment that caused Evan Smith to rely on Dr. Henderson for medical care.

(2) The trial court's definition of "agency relationship A" is harmful error because:

(a) it does not include the required causal link between a representation of employment and reliance on Dr. Henderson's skill;

(b) it is not limited to representation of a relationship in which BMHS would have a right to control Dr. Henderson's work.

(3) The evidence is legally insufficient to support the jury's answer concerning "agency relationship B," in that there is no evidence:

(a) it was a reasonable belief in employment that caused Evan Smith to consent to Dr. Henderson's treatment;

(b) BMHS intentionally or carelessly caused Evan Smith to believe that Dr. Henderson was its employee;

(c) BMHS knew Evan Smith had such a belief or that BMHS failed to notify him to the contrary.

(4) The trial court erred in submitting "agency relationship B," and the submitted definition itself is harmful error, because:

(a) instead of defining a theory of vicarious liability for negligence, "agency relationship B" relates to the enforceability of a transaction that someone purported to make on the account of another, which is a question not material to the case;

(b) even if applicable, the definition does not require a finding that Dr. Henderson was the employee of BMHS, and it allows an affirmative answer on findings that do not establish a basis for vicarious liability.

(5) The trial court erred in overruling BMHS's motion for new trial, because there is insufficient evidence to support the jury's answers concerning "agency relationship."

(6) The trial court erred in rendering judgment against BMHS, because the theory in question should not be applied under the circumstances of this case to make BMHS vicariously liable for Dr. Henderson's negligence.

(7) There is insufficient evidence to support the jury's answers to the damage questions and because the awards are excessive.

(8) There is insufficient evidence to support negligence and proximate cause findings against Dr. Henderson.

At the outset, we consider appellant's sixth point of error in which BMHS contends that the doctrines of ostensible agency and agency by estoppel are not recognized in Texas under the factual circumstances such as those in this lawsuit and are not applicable to this case. We observe that BMHS has previously offered this argument when this case was appealed to this court following the granting of a summary judgment in favor of BMHS, on the premise that, as a matter of law, BMHS could not be vicariously liable for the negligent acts of Dr. Henderson on a theory of ostensible agency. *See Smith v. Baptist Memorial Hosp. System,* 720 S.W.2d 618, 625 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). In overturning the summary judgment, we found that a material fact issue regarding Dr. Henderson's agency was properly raised.[4] In the former ap-

---

**4.** In our former opinion on the summary judgment, we observed that:

The facts are undisputed that Dr. Henderson was on duty at the Emergency Room of BMHS at the time Smith was admitted for examination. The simple fact Dr. Henderson manifested the authority of a com-

peal, this court did not find that there was ostensible or apparent agency between Dr. Henderson and BMHS, only that a fact issue was properly raised on the subject, and we reversed and remanded the case for further proceedings. In the instant appeal, we note that the issue of apparent or ostensible agency between a hospital and an emergency room physician has been submitted for consideration and addressed in

> petent physician placed the fact issue of ostensible authority in issue.
> 720 S.W.2d at 624–25. In holding that Smith, the non-movant for summary judgment, "successfully raised material issues of fact regarding the ostensible agency of Dr. Henderson and the vicarious liability of BMHS and EPA", we reversed and remanded the case for further proceedings. *Id.* at 627.

5. Acknowledging that "the concept of ostensible agency has thus far been applied only in cases where patients were treated by hospital emergency room physicians", the Committee on Pattern Jury Charges of the State Bar of Texas, in its most recent publication on the subject, noted the derivation of the theory from Restatement (Second) of Agency § 267 (1958) and "expresse[d] no opinion on whether it should be applied in other circumstances." 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 52.04 (1990).

Although the case proceeded to trial on Plaintiffs' Sixth Amended Original Petition, thereafter, on motion filed following the jury verdict, Smith sought and obtained leave of the court to file Plaintiffs' Eighth Amended Original Petition, which deleted its previous allegations of direct corporate liability against BMHS, and alleged, *inter alia,* liability against BMHS on the following bases:

#### III.

Plaintiffs would show that at the time of the incident made the basis of this suit, the emergency room of BAPTIST MEMORIAL HOSPITAL SYSTEM was being supervised and controlled by BAPTIST MEMORIAL HOSPITAL SYSTEM. At all times material hereto, DR. HENDERSON, during the time he was caring for and responsible for the care and treatment of EVAN W. SMITH, JR., was acting as the agent, servant or employee of BAPTIST MEMORIAL HOSPITAL SYSTEM. DR. HENDERSON was either the actual or constructive agent of BAPTIST MEMORIAL HOSPITAL SYSTEM. Pleading further, Plaintiffs say that DR. HENDERSON was the ostensible or apparent agent of Defendant, BAPTIST MEMORIAL HOSPITAL SYSTEM. Because of the facts and circumstances surrounding the care rendered by these individuals to EVAN W. SMITH, JR., Defendant, BAPTIST MEMORIAL HOSPITAL SYSTEM, is further

the jurisprudence of this state in at least two separate instances. *See Nicholson v. Memorial Hospital System,* 722 S.W.2d 746 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) and *Brownsville Medical Center v. Gracia,* 704 S.W.2d 68 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).[5]

The case was submitted to the jury on three questions.[6] The first inquired wheth-

> estopped from denying that the aforesaid, DR. HENDERSON, was in fact the agent of said Defendants. DR. HENDERSON was negligent in his diagnosis, care and treatment of EVAN W. SMITH, JR. and such negligence was the proximate cause of MR. SMITH's resulting injuries and damages.

#### VI.

At all times material hereto, DR. HARRY HENDERSON, the nurses, nursing supervisors, technical and medical personnel who were caring for or responsible for the care and supervision of EVAN W. SMITH, JR. were acting as the agents, servants or employees of BAPTIST MEMORIAL HOSPITAL SYSTEM. These individuals were either the actual or constructive agents of said Defendants. Pleading further, Plaintiffs say that said individuals were the ostensible agent of BAPTIST MEMORIAL HOSPITAL SYSTEM. Because of the facts and circumstances surrounding the care rendered by these individuals to EVAN W. SMITH, JR., this Defendant is estopped from denying that the aforesaid individuals were in fact the agents of said Defendants.

Separately, Plaintiffs alleged negligence against Dr. Henderson in seventeen distinct instances, including the failure to monitor Mr. Smith's condition after administration of a drug known to cause allergic reactions, and negligence in the performance of a tracheostomy.

6. The following questions, germane to consideration of Point of Error Six, were submitted to the jury at the conclusion of the evidence:

> #### QUESTION NO. 1
> Was the negligence, if any, of DR. HARRY HENDERSON, a proximate cause, if any, of the injuries to EVAN W. SMITH, JR.?
> Answer, "Yes" or "No."
> WE, THE JURY, ANSWER: Yes
> If you have answered Question No. 1, "Yes," and only in that event, then answer Question No. 2. Otherwise, do not answer Question No. 2.
> #### QUESTION NO. 2
> On the occasion in question, was there an agency relationship between DR. HARRY HENDERSON and NORTHEAST BAPTIST HOSPITAL? You are instructed that an agen-

er the negligence, if any, of Dr. Henderson, was a proximate cause, if any, of the injuries to Evan W. Smith, Jr. The second question, conditioned on an affirmative response to the first question, was not required to be answered in the absence of a finding of Dr. Henderson's negligence and proximate cause of Mr. Smith's injuries. The third question addressed ten separate components of damages.

It is significant that the submission of the second question regarding "agency relationship A" (the ostensible agency issue), while not identical to, fully comports with the suggested jury submission in Pattern Jury Charges. *See* 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 52.04 (1990). It is also noteworthy that the second question was submitted disjunctively, with an affirmative finding on the existence of either alleged agency relationship sufficient to predicate liability to BMHS.

In *Brownsville Medical Center v. Gracia*, 704 S.W.2d 68 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), the court of appeals was confronted with a factual scenario similar in many respects to that confronting us in this case. In both cases, (1) the hospital had contracted with a group of physicians to staff its emergency room; (2) the emergency room physician who rendered the treatment at issue was hired by that group of physicians; (3) patients entering the emergency room typically did not ask for a physician by name, but would simply ask for a doctor to render treatment; (4) there was nothing to indicate to a patient entering the emergency room whether the treating physician was an independent contractor or an employee of the hospital; and (5) the hospital billed the patient for services of the emergency room

doctor, as well as for other services rendered in the emergency room. The court in *Gracia* addressed the issue of apparent or ostensible agency, as follows:

> An 'apparent' or 'ostensible' agent has been defined as 'one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, though he has not, either expressly or by implication, conferred authority on him.' *Walter E. Heller & Co. v. Barnes*, 412 S.W.2d 747 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.). Restatement (Second) of Agency § 267 (1958) sets forth the following rule of 'apparent' or 'ostensible' agency applicable to this case;
>
> § 267. Reliance upon Care or Skill of Apparent Servant or Other Agent
>
> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.
>
> Furthermore, Restatement (Second) of Torts § 429 (1966) provides:
>
> § 429. Negligence in Doing Work Which is Accepted in Reliance on the Employer's Doing the Work Himself
>
> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, *to the same extent as though the employer*

cy relationship existed if either of the following circumstances occurred:

A. If NORTHEAST BAPTIST HOSPITAL, acting through its employees or agents, represented by act, conduct or statement that DR. HARRY HENDERSON was its employee or agent, and caused EVAN W. SMITH, JR., to justifiably rely on the care or skill of DR. HARRY HENDERSON,

Answer "Yes" or "No" Yes

OR

B. If EVAN W. SMITH, JR., consented to the emergency room care in question on the reasonable belief that DR. HARRY HENDERSON was the employee of NORTHEAST BAPTIST HOSPITAL, and NORTHEAST BAPTIST HOSPITAL intentionally or carelessly caused such belief, or NORTHEAST BAPTIST HOSPITAL knew of such belief but failed to notify EVAN W. SMITH, JR., that his belief was mistaken.

Answer "Yes" or "No" Yes

*were supplying them himself or by his servants.*

*Id.* at 74 (emphasis supplied). Upon reviewing the extant authorities on the issue of apparent or ostensible agency in a hospital emergency room setting, we find that such a legal theory is cognizable in Texas and a majority of jurisdictions. *See also Nicholson v. Memorial Hosp. System,* 722 S.W.2d 746 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Moreover, we reject appellant's contention that this appeal should not be governed by this court's former holding in the first appeal that "the summary judgment evidence properly raised the material fact issue of Dr. Henderson's agency." *See Smith v. Baptist Memorial Hosp. System,* 720 S.W.2d 618, 625 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.).

BMHS now contends that holding was "clearly erroneous" and is not binding in the instant appeal, since it urges that the doctrines of ostensible agency and agency by estoppel are not recognized in Texas. Moreover, we note appellant's argument that the "law of the case" doctrine is not applicable here because this court's prior *Smith* opinion was "clearly erroneous", citing *Texas Employers Insurance Ass'n v. Tobias,* 740 S.W.2d 1 (Tex.App.—San Antonio 1986, writ denied).[7] BMHS has the burden in this appeal of establishing that the prior decision was "clearly erroneous" under TEX.R.APP.P. 50. For the reasons stated hereinafter, we hold that appellant has failed to sustain that burden.

■ Recognizing that the law of the case doctrine is applicable when the issues or the facts presented at successive appeals are substantially the same as those involved in a prior appeal, the Supreme Court of Texas defined the doctrine, stating:

The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. By narrow-

ing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. The doctrine is based on public policy and is aimed at putting an end to litigation.

*Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). When the Supreme Court of Texas refuses an application for writ of error with the notation "no reversible error," the "opinion and its judgment were ... approved as being without error by our Supreme Court." *Tobias, supra,* at 2. Appellant merely reiterates the arguments rejected by this court previously in the former *Smith* appeal from summary judgment. We hold that appellant has failed to establish that this court's opinion in that appeal was "clearly erroneous." This court's prior opinion clearly held that the theories of ostensible agency and agency by estoppel are recognized in Texas. When the supreme court refused the writ "no reversible error," the issues refined by the prior appeal became the "law of the case" in the subsequent trial on substantially those same issues.

Although intervening amendments to the pleadings have been made since the former *Smith* decision, the doctrines of ostensible agency and agency by estoppel remained the primary and focal points of Smith's theory of recovery. It is noteworthy that in its pleadings and arguments before the trial court, particularly in its motion for directed verdict during trial, appellant invoked this court's prior *Smith* decision as the law of the case; now the same party asks us to reject that decision as "clearly erroneous." We cannot countenance such an inconsistency in appellant's contentions. Appellant's sixth point of error is without merit and is hereby overruled.

We next address appellant's first and second points of error in which BMHS challenges, respectively, the legal sufficiency of the evidence to support the jury's an-

---

7. However, *Tobias* does not stand for the proposition that a past "clearly erroneous" opinion of this court is void. While this court did find its previous opinion erroneous, we nevertheless stated that the "prior opinion is *not void,* it is simply wrong. But erroneous or not, *res judicata* prohibits its reconsideration." 740 S.W.2d at 2 (emphasis supplied).

swer concerning "agency relationship A" and the alleged harmful error by the trial court in defining that relationship. Specifically, the second point of error complains that the trial court's definition of "agency relationship A" does not include the required causal link between a representation of employment and reliance on Dr. Henderson's skill, and that the definition is not limited to representation of a relationship in which BMHS would have a right to control Dr. Henderson's work.

■ In order to complain on appeal that an issue in the trial court's charge is defective, one must object. To preserve error, the objecting party must also obtain a ruling on the objection from the trial court. TEX.R.CIV.P. 272; *see also Lyles v. Texas Employers' Ins. Ass'n*, 405 S.W.2d 725 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.). In the absence of an express ruling, the objection is presumed to have been overruled, and thus preserved, only if the trial judge does not change the charge once the objection was made. *Acord v. General Motors Corp.*, 669 S.W.2d 111, 114 (Tex.1984).

■ A party which objects to an alleged defect in the submission of an issue, definition or instruction must point out its objection with particularity. TEX.R.CIV.P. 274. When the complaint on appeal is that the trial court's submission was improper because it failed to define a term susceptible to more than one meaning, the complaining party must have submitted to the court a substantially correct definition or instruction. *Woods v. Crane Carrier Co., Inc.*, 693 S.W.2d 377, 379 (Tex.1985).

■ It is also necessary that the party complaining on appeal must have objected specifically to elements of a ground of recovery that it claims are missing or omitted from the court's charge. *Champion v. Wright*, 740 S.W.2d 848, 855 (Tex.App.—San Antonio 1987, writ denied). The failure to object to any alleged omission of elements in the charge necessary to com-

prise a successful ground of recovery waives any error. *Id.* In the absence of a proper objection, the omitted issue or element is "deemed found" by the trial court in support of its judgment. *Id., citing* TEX.R.CIV.P. 279; *City of Houston v. Black*, 571 S.W.2d 496 (Tex.1978).

■ In reviewing the record, we observe that appellant objected regarding "supposed liability fact 'A' on the grounds that it omits the causal link clearly required by Section 267 of the Restatement 2nd of Agency", whereupon Smith's counsel proposed amendatory language, which was then inserted and which appellant's counsel concurred "would put the causal connection in there." There was no ruling on the initial objection, and there was no objection to the amendatory modifications. We find under the record before us that BMHS waived any objection concerning the causation element of the ostensible agency instruction.[8]

■ Further, BMHS urges that the word "agent" is susceptible to more than one meaning in this case, but BMHS failed to submit a substantially correct definition of the term "agency" or a limiting instruction, and, therefore, cannot complain on appeal of the submission of that term as utilized in the charge. This failure is fatal to appellant's complaint on appeal. *See* TEX.R.CIV.P. 278; *Woods v. Crane Carrier Co., Inc.*, 693 S.W.2d 377, 379 (Tex.1985).

■ In reviewing a point of error based on insufficiency of the evidence, the inquiry is whether the jury's findings, when all the evidence is considered and weighed, are against the overwhelming weight and preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). We find, in response to the first point of error, that there was abundant evidence that BMHS represented "by act, conduct or statement" that Dr. Henderson was its employee or agent.

The evidence showed that upon a patient's arriving at the hospital emergency

---

8. BMHS's attorney, following the proposed amendatory language, is on record as stating that the suggested language took care of the problem. The objection, if any, was never reurged.

room, he would be greeted by a hospital office clerk responsible for meeting the patient. In this case, that clerk was Vicki Walters whose function was also to obtain assistance from a nurse or physician for a patient in need of immediate medical attention. The receptionist in the emergency room collected physician's fees, as well as hospital fees for the use of the emergency room. Upon departing, patients paid this clerk or receptionist; the bills for the physician's and the hospital's charges were prepared "in the back". These bills were not given to the patients, but were in the patient's chart; the billings in the chart were not separated in the chart until after the services were rendered. Arriving patients were told they were expected to pay in cash, which payments were collected by the receptionist who maintained a cash box. At the end of the receptionist's work shift the physician collected the cash payments due him which had been collected from patients. There was testimony that Ms. Walters attempted to talk with Evan Smith, but wound up talking with his friend Mel Hay. On a medical diagnosis such as sore throat or flu, the hospital policy was to collect cash, and this was explained to Mr. Smith or Mr. Hay.

Moreover, the evidence demonstrated that the emergency room physicians were present in the emergency room of the hospital when a patient arrived. Ms. Walters further testified that she did not personally know the relationship between EPA and the doctors who worked in the emergency room, and that a patient at the hospital would not likely have any greater knowledge about this relationship than she did. She also testified that Mr. Smith, who stated that he had no personal physician (in response to her question), indicated that he wanted to be seen by the emergency room physician. In deposition testimony which was read at trial, Ms. Walters stated, regarding emergency room patients with no personal physician:

> If they tell me they don't have their own doctor, that's when we are supposed to ask them if they want to see *our Emergency Room doctor*. Unless they ask you if they have a doctor there that can

treat them, in which case we say the Emergency Room doctor who is on duty.

There was testimony that after the completion of initial paper work, Mr. Smith would have remained in the waiting area until he could be seen by the emergency room physician on duty.

Dr. Henderson's name was typed on Mr. Smith's admitting form "because he was on duty." Dr. Henderson admitted he was aware of no notices in the emergency room of the hospital advising patients who came in that there was an agreement or contract between the hospital and EPA, and Ms. Walters stated that a patient would not necessarily be informed of the relationships between the hospital, the physicians, and EPA, unless the patient had a question regarding his billing for services as he departed the emergency room, in which event he would be given a card with information regarding EPA. Obviously, Mr. Smith did not depart the emergency room in such a manner as to have received any such notice, and the record does not reflect that he ever received such information.

Dr. Henderson testified that the hospital expected that he would render proper care to patients who presented in the hospital emergency room. In *Rourke v. Garza*, 530 S.W.2d 794, 803–804 (Tex.1975), the Supreme Court of Texas held that "[i]n certain situations, appointing a person to a position may be sufficient in itself to create an apparent authority," with the proviso that "apparent authority in such cases exists only as to those things ordinarily entrusted to one occupying such a position." Clearly, under the evidence presented, BMHS placed Dr. Henderson in a position of authority, with the implied representation that he was an employee of the hospital.

Finally, in the permission to treat form signed by Evan Smith before Ms. Walters, there was no reference to either EPA or to Dr. Henderson; the form only identified "Baptist Memorial Hospital" and "chosen physician" in the following manner:

> The undersigned does hereby give to the authorities of the Baptist Memorial Hospital, San Antonio, and chosen physician,

permission to administer such medication and perform such procedures, including surgical operation with suitable anesthetic as may be deemed necessary by the medical staff for the best interest and care of [patient's name].

The form also requires that the patient "promise to pay Baptist Memorial Hospital, Bexar County, San Antonio, Texas and/or Systems Hospitals, *all charges* for this patient in accordance with the regular tariffs of the hospital." We find there was ample representation "by act, conduct or statement" of Northeast Baptist Hospital to warrant the jury's affirmative finding that Dr. Henderson was its agent or employee and caused Mr. Smith to justifiably rely on the care and skill of Dr. Henderson. The first point of error is accordingly overruled. Based on BMHS's failure to properly preserve error regarding the submission of "agency relationship A", its second point of error is also overruled.

Having already noted that the two parts of Question 2 were submitted disjunctively, such that an affirmative finding by the jury on either Question 2(A) or 2(B) would be a sufficient basis on which to award damages, and having found no error in the court's submission of Question 2(A), as well as sufficient evidentiary support to sustain the jury's affirmative finding on that question, it is irrelevant whether we find that Question 2(B) was properly submitted. Nevertheless, in view of appellant's third and fourth points of error, we will consider the correctness of the submission.

▆▆ In its third point of error, BMHS alleges that the evidence is legally insufficient to support the jury's answer concerning "agency relationship B," or agency by estoppel, in that there is no evidence (a) it was a reasonable belief in employment that caused Evan Smith to consent to Dr. Henderson's treatment; (b) BMHS intentionally or carelessly caused Evan Smith to believe that Dr. Henderson was its employee; and (c) BMHS knew Evan Smith had such a belief or that BMHS failed to notify him to the contrary.

In contrast to the theory of vicarious liability which formed the basis for "agen-cy relationship A", discussed previously, section 8B, Restatement (Second) of Agency, together with Restatement sections 8 and 27, addresses another variant of vicarious liability—the status of parties to a transaction, which arises, according to appellant, when one "professes" to be acting as "agent for" or "on account of" another. The effect of these three sections, once their elements are established, is to bind one to a transaction that another person purported to make for him. In their brief, appellant has asserted that section 8B

> describes an estoppel that binds one to a transaction professed to have been made on his behalf by another who did not even have apparent authority.

Under section 8B, from which "agency relationship B" derived, a transaction is enforceable only when the claimant changed positions because of such an incorrect belief, and then only if the party to be bound caused the incorrect belief or knew of it and failed to correct it. It is appellant's contention that BMHS should not be bound by the acts of Dr. Henderson who, BMHS contends, lacked even apparent authority to bind the hospital.

In response, Smith contends that reliance on the hospital's representations was firmly established either by direct evidence or by clear inference. In particular, Smith avers that the evidence showed that Evan Smith read and signed the consent form prior to his treatment; that he did not ask specifically for Dr. Henderson, but was only seeking treatment by a qualified emergency room physician; that he was asked by the hospital's admitting clerk if he wanted to see one of "our" doctors; and that the friend who accompanied him expressed the understanding that the hospital would provide a skillful physician to treat Mr. Smith.

Moreover, Smith argues that BMHS "intentionally or carelessly caused" Evan Smith's reasonable belief that Dr. Henderson was an employee of the hospital, by virtue of the admitting clerk's representations regarding "our" doctors and statements in the consent form referring to a "chosen" doctor. In addition, Smith

points to the hospital system's advertisements in 1979 and 1980 editions of San Antonio Magazine, which contained references to "Skilled Health Care Professionals," which were not limited to skilled "nurses" or skilled "technicians"; specific reference was made to hospital emergency rooms "staffed twenty-four hours a day by licensed physicians."

Further, the murky relationship between the hospital and EPA, at least to the extent that the attention of patients was not drawn upfront to EPA's contractual provision of physicians to staff the hospital's emergency room, is an additional basis from which the jury could reasonably find the hospital "intentionally or carelessly caused" Evan Smith to believe Dr. Henderson was a hospital employee and that it failed to notify him to the contrary. Finding evidence legally sufficient to support the jury's finding, we overrule appellant's third point of error.

Appellant's fourth point of error is concerned also with the submission of "agency relationship B." In summary, appellant argues that even if applicable, the definition for this relationship does not require a finding that Dr. Henderson was the employee of BMHS, and it allows an affirmative answer on findings that do not establish a basis for vicarious liability. As we understand appellant's argument, it complains, as it did in the trial court, that this question would "only be applicable if Evan Smith submitted to treatment because he believed it was Baptist who would be performing the services at issue, not Dr. Harry Henderson. The person estopped must be able to actually do or perform what is to be done." Smith responds that the former *Smith* opinion, citing the decision of the

Ohio Court of Appeals in *Hannola v. City of Lakewood,* 68 Ohio App.2d 61, 426 N.E.2d 1187, 1190 (1980),[9] laid the groundwork for this submission, where this court held:

An agency by estoppel is established by creating the effect that the appearance that hospital's agents, not independent contractors, will provide medical care to those who enter the hospital.... The appearance is what the patient observes and relies upon when .entering a full-service hospital.

720 S.W.2d at 625. Finding no basis for error, we overrule BMHS's fourth point of error.

In its fifth point of error, BMHS contends the trial court erred in overruling its motion for new trial, because there is insufficient evidence to support the jury's answers concerning "agency relationship." In its argument under this point of error, BMHS asserts that:

A review of the entire record concerning the two 'agency relationship' fictions leaves a 'visceral' feeling that the jury's answers are manifestly wrong and unjust.... The jury probably based its answers on irrelevant features of the trial.

BMHS speculates that "the jury probably answered 'yes' to Question 2 because they were persuaded to disagree with the legitimacy of the independent contractor doctrine." In a footnoted aside, BMHS urges that "[t]he jury did not know and could not be told that the law provided valid theories of hospital liability, all of which Smith later dropped for lack of evidence." This argument ignores that Smith's action against

---

9. We note the recent decision of the Supreme Court of Ohio in *Albain v. Flower Hospital,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990), which discussed *Hannola* and its progeny of cases, with respect to the relationship between a physician (who was an independent contractor) and a hospital. The court in *Albain* held that:

In order for a hospital to be held liable for the negligent acts of an independent physician with staff privileges, under the doctrine of agency by estoppel, a plaintiff must show: (1) the hospital made representations leading the plaintiff to believe that the negligent physi-

cian was operating as an agent under the hospital's authority, (citation omitted); and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship, (citation omitted). As to this second element, we stress that the question is whether the plaintiff relied on the ostensible agency relationship, *not* whether the plaintiff relied on the reputation of the hospital.

*Id.* 553 N.E.2d at 1049–50 (emphasis original). Having found that both these prongs were satisfied in the instant case, we find no basis for error in relying on *Hannola.*

the hospital based on ostensible agency or agency by estoppel, which has already been discussed at length in response to BMHS's sixth point of error, is itself a "valid theory of hospital liability," and on that ground, the jury found liability against BMHS, which is amply supported in the record (both as to factual and legal sufficiency) as detailed elsewhere in this opinion. We overrule appellant's fifth point of error.

In its seventh point of error, BMHS contends the trial court erred in overruling its motion for new trial, because there is insufficient evidence to support the jury's answers to the damage questions and because the awards are excessive. Specifically, in support of this contention BMHS points to the jury's award of $300,000 for past medical expenses, despite documentary proof of only $165,406.27 for the nine years preceding the trial.[10] Appellant does not challenge the damages awards for lost wages in the past ($150,000) or for loss of future earning capacity ($200,000). BMHS argues that under *Larson v. Cactus Utility Co.*, 730 S.W.2d 640 (Tex.1987), it is entitled to a new trial or a substantial remittitur on the remaining damages awarded by the jury.

In assessing personal injury damages, the jury necessarily has great discretion in fixing the amount of the damage award. *Bundick v. Weller*, 705 S.W.2d 777, 783 (Tex.App.—San Antonio 1986, no writ), *citing Roberts v. Tatum*, 575 S.W.2d 138 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). There is no fixed guide or rule in measuring damages; thus, the amount determined by the jury is subject to correction only for abuse or excessiveness. *Landreth v. Reed*, 570 S.W.2d 486 (Tex.Civ.App.—Texarkana 1978, no writ).

BMHS urges that most of the damages awarded by the jury are so excessive as to be manifestly unjust. In reviewing the damages, BMHS argues that this court must consider that Evan Smith was 55 years old at the time of the occurrence; at time of trial, he was 64 years old, with a life expectancy of 14.6 additional years.

In *Chemical Express v. Cole*, 342 S.W.2d 773 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.), one court of appeals held that in determining whether a damage award is excessive, the appellate court must view the evidence and facts of the case in the light most favorable to the damage award. The mere fact that an award is large is no indication of passion, prejudice or improper motive. *International Harvester Co. v. Zavala*, 623 S.W.2d 699 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

The jury awarded future medical expenses of $3,000,000, and Smith voluntarily remitted $1,675,488 in the trial court, leaving an award of $1,324,512, which BMHS contends is still excessive. BMHS argues that a plaintiff is entitled only to future expenses proven to be reasonably necessary and probable. *See City of Rosenberg v. Renken*, 616 S.W.2d 292, 293 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). The jury's award of $3,000,000 for future medical expenses amounted to approximately $205,000 for each year of Smith's projected life expectancy; following the voluntary remittitur, the annual allocation still amounted to approximately $90,720 over each year of his life expectancy.

Against a background demonstrating that only $165,406.27 had been expended in Smith's care over the nine years since his injury, BMHS urges that the future medical expenses awarded, either pre- or post-remittitur, are still excessive. BMHS points to evidence in the record which demonstrates that Evan Smith would continue to need the same level of care he had been receiving over the previous nine years; that he had been receiving round-the-clock nursing home care since 1980, the cost of which was less than $1,400 per month; that no additional care was anticipated beyond that which Evan Smith was receiving at the time of trial; and that at least $40,000 of Smith's past medical expenses had been for non-recurring costs connected with treatment of the underlying incident nine years before trial. The award following remit-

---

10. In fact, in response to BMHS's challenge of the award, Smith agreed that the trial court should render judgment for only $165,406.27 for past medical, nursing, and custodial expenses, which is reflected in the judgment.

titur is, according to appellant, "over six times what his actual expenses had been." Although appellant acknowledges that future medical expenses are not required to be proven with absolute precision, BMHS argues that an award so at odds with the evidence should not be upheld.

 In *City of San Antonio v. Vela,* 762 S.W.2d 314 (Tex.App.—San Antonio 1988, writ denied), this court wrote:

Adhering to the 'reasonable probability' rule, the Texas courts have also consistently held that the award of future medical expenses is a matter primarily for the jury to determine ... The jury may make its award based upon the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial.

*Id.* at 321. Smith urges that the award of $1,324,512 for "medical, nursing and custodial expenses in the future" should stand, and points to evidence in the record which demonstrates that "the only reason [Smith's] existence in the nursing home has been tolerable at all is because he has two sisters and a niece who come and stay with him every day," in the process performing a wide spectrum of personal care functions for him, which would otherwise have to be performed by trained nursing personnel, including monitoring him because of his incontinence of feces and urine, and helping him with his meals, daily care and medication. An appellate court should be reluctant to disturb the award, particularly after substantial remittitur has been made, *see Caterpillar Tractor Co. v. Boyett,* 674 S.W.2d 782 (Tex.App.—Corpus Christi 1984, no writ), and we find legally and factually sufficient evidence in the record to support the post-remittitur award of future medical expenses.

 With respect to the damages awarded by the jury for non-pecuniary losses, BMHS attacks the respective awards of $4,000,000 for physical impairment in the past and in the future; $2,000,000 for physical pain and mental anguish in the past and in the future; and $1,500,000 for disfigurement in the past and in the future. Appellant argues that strict scrutiny of

such damage awards is appropriate where such damages are "by their very nature, subjective, difficult to quantify, and not readily controvertible by the defense."

Appellee responds that the award for past and future physical impairment is not excessive, where the evidence demonstrated that Evan Smith was a "total bed care patient, who requires maximal assistance in everything," including feeding, bathing, dressing, and attention to personal hygiene. Moreover, because of his inability to walk and his complete dependence on a wheelchair for mobility and of his speech impairment and cortical blindness, Mr. Smith is physically precluded from engaging in the activities which he performed before his treatment at the Northeast Baptist Hospital. In *Caterpillar Tractor, supra,* the court observed its duty "to exercise sound judicial judgment and discretion in the ascertainment of what constitutes reasonable compensation for the injuries suffered," and then noted:

There is no certain standard by which personal injury damages can be measured, and each case must stand on its own facts and circumstances, and a comparison with other cases on amounts of verdicts are of little or no help.

*Id.* at 790. We find no basis, therefore, on which to compare the damages awarded for past and future physical impairment in this case, with such damages that have been awarded in other personal injury litigation. There is ample evidentiary support in the record to sustain the damages awarded for past and future physical impairment in the instant case, and the award by the jury will stand.

 Regarding the alleged excessiveness of the damage awards of $1,000,000 each for past and future physical pain and mental anguish, BMHS points to testimony of Patricia Culbertson, administrator of the nursing home in Lufkin where Mr. Smith resides, in which she stated that in her personal experience, she had not seen Mr. Smith when she felt he was in pain. However, immediately thereafter, Mrs. Culbertson testified that it was her opinion that Mr. Smith "can feel pain or sense pain."

Two of Mr. Smith's brothers and his sister testified regarding his pain and mental anguish. Earl Smith testified that, despite great difficulty communicating, Evan Smith sometimes tightens up, stretches, leans back, and says "hurt." Another brother, William Bonney, stated that Evan Smith sometimes appears to be in pain, as indicated by his facial expressions, and that he cries sometimes. Evan Smith's sister, Oleta Beasley, testified that he is in pain, that he has told her he hurts, and that various parts of his body are sore; she stated also that she has observed her brother crying "very often" over the years since he became disabled. The jury also observed Evan Smith in the courtroom during the trial, when he twice cried out in their presence.

There was also objective evidence of pain in the trial record. Specifically, since his confinement in the nursing home, Mr. Smith has had bedsores and diaper rash. He has also experienced stiffness in his joints, and he has problems with his toenails, which get sore and ooze pus. We note, but do not accord significance to, appellant's contention that these damages should be denied because there is no evidence Evan Smith required medication for pain or that he would suffer any different degree of pain in the future.

As to Mr. Smith's mental anguish, there was testimony that, despite his brain damage which has caused severe physical limitations, he is not brain-damaged to the extent that he is unaware of his circumstances. He is aware he is in a nursing home; is probably oriented to time and place; and comprehends what is occurring around him. As a result of his awareness of his limitations, Dr. James Williams has described him as exhibiting depression.

■ BMHS also attacks as excessive the $500,000 award for past disfigurement and $1,000,000 for future disfigurement. Disfigurement has been defined as "that which impairs the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner." *Goldman v. Torres*, 161 Tex. 437, 341

S.W.2d 154, 160 (1960). Obviously, the jury was able to view Evan Smith when he was brought into the courtroom in the presence of the jury. Additionally, the jury was permitted to view pre– and post-injury photographs of him during the course of trial. Moreover, Dr. Whitman Rowland testified that Evan Smith demonstrated flexion contractures of the left arm and both legs, which occurs when the arm or leg is immobilized or drawn. Dr. Williams testified that Mr. Smith received physical therapy in an effort to rehabilitate and improve his limb contractures, his ability to sit by himself, and his ability to stand in a standing box, but demonstrated very little improvement. We are not persuaded by BMHS's argument that damages traditionally awarded for disfigurement can only be assessed for scars, burns, or amputations. While these are common forms of disfigurement, appellant has cited no authority which would deny Evan Smith damages for the contorted limbs and facial deformity he demonstrated at trial.

With regard to BMHS's argument there is no support for the award of twice the amount of damages for future disfigurement as for past disfigurement, we observe that in *Hopkins County Hospital District v. Allen*, 760 S.W.2d 341 (Tex.App.—Texarkana 1988, no writ), the jury also awarded twice the damages for future disfigurement as it did for past disfigurement, despite the lack of evidence suggesting further scarring or deformity in the future. In analyzing other Texas decisions involving disfigurement, the court concluded:

> One principle emerges from our analysis of future disfigurement case law: proof of additional scarring or deforming is not required to recover damages for future disfigurement, although it may be considered as a factor in determining the damages.... [P]laintiffs ... may recover disfigurement damages absent evidence that there will be further scarring or deforming.

*Id.* at 344. The clear distinction in Plaintiff's Exhibit 12 between the appearance of Evan Smith prior to his treatment at BMHS and after that treatment was appro-

priate for the jury's consideration, and the jury was within its discretion to award him damages for disfigurement in the past and in the future for a total of $1,500,000.

While appellant asks that this court further reduce the damages awards which it deems excessive, it is significant that the trial court has already done so, with regard to the awards for past and future medical and related expenses. If we were to arbitrarily order remittitur, in the complete absence of any evidence in the record to justify such a reduction, we would in effect be substituting our judgment for that of the jury which considered the evidence in this case; had an opportunity to observe Evan Smith in person and in pre- and post-injury photographs; and determined the weight it desired to accord the credible evidence. The evidence was factually sufficient to support the damages awarded. *See Pope v. Moore*, 711 S.W.2d 622 (Tex.1986). The seventh point of error is overruled.

In its eighth and final point of error, BMHS urges there is insufficient evidence to support negligence and proximate cause findings against Dr. Henderson. BMHS contends that appellees relied on two theories at trial to establish negligence: (1) the failure to timely establish an airway; and (2) the failure to completely diagnose Evan Smith's condition. In support of this ground of error, BMHS argues that the evidence on each theory is insufficient in that it fails to establish either (1) the applicable standard of care or any deviation from such a standard; and/or (2) that any deviation from the standard of care proximately caused Mr. Smith's present condition.

When presented with a factual sufficiency challenge, this court must consider all the evidence, and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is "clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). A challenge based on factual insufficiency does not permit this court to retry the case or substitute its judgment for that of the jury. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

The evidence before the jury demonstrated that Evan Smith arrived at the emergency room of Northeast Baptist Hospital on June 22, 1980 around noon, complaining of a sore throat, difficulty swallowing, a fever of 102 degrees, and chills. His voice was muffled and he appeared pale and sick, and in Dr. Henderson's own words "was probably septic," and he had a "very tender anterior neck." Dr. Henderson, as the emergency room physician assigned to Evan Smith, looked at the back of Smith's throat, using a tongue blade and a light, and observed exudate, red inflammation, and swelling.

Dr. Henderson diagnosed Mr. Smith as having acute pharyngitis, a general term for acute inflammation of the throat, and ordered a throat culture and two injections of antibiotics which were administered at 2:25 p.m., approximately two-and-one-half hours after arriving in the emergency room. A blood sample for a white blood cell count was also taken.

During this time, Dr. Henderson did not attempt to secure an airway or to visualize the epiglottis with a laryngoscope, which would have given him information about the upper airway. He did not obtain a consultation from an ear, nose and throat (ENT) specialist, although ENT specialists, who more typically perform laryngoscopies, were available for consultation that day. Had Dr. Henderson looked at Evan Smith's epiglottis, he would have observed that it was swollen and red and that the patient had epiglottitis or supraglottitis. Dr. Henderson did not obtain an x-ray of the neck, despite the fact it was possible to take neck x-rays in the emergency room and that such an x-ray might have given him important information regarding the upper airway. He did not take these precautionary measures, although he was familiar with epiglottitis and knew that epiglottitis is a dangerous condition that presents a medical emergency. Dr. Henderson specifically considered epiglottitis in his differential diagnosis and was concerned about it; he understood how it was supposed to be treated.

Evan Smith went into respiratory arrest five minutes after he was given antibiotic injections. Dr. Henderson was summoned and ordered adrenaline epinephrine to be administered directly into the patient's heart. He ordered an oropharyngeal airway to be placed and attached a mask to that airway to attempt to push air into the lungs. Thereafter, he removed the oropharyngeal airway and attempted to insert a laryngoscope. He was then able to visualize (with the laryngoscope) that Evan Smith had suffered a complete obstruction of the airway. His effort to place an endotracheal tube in the patient, while using the laryngoscope, failed, and Dr. Henderson then decided to perform a tracheostomy, which involves making a surgical opening in the trachea, inserting a tube in the opening, and attaching that tube to a machine which pumps air into the patient's lungs.

The tracheostomy incision made by Dr. Henderson was larger than the tracheostomy tube and had to be held in the incision by a nurse. The incision was characterized as irregular. The tissue was separated, the jugular vein was lacerated and there was active free bleeding, requiring that Mr. Smith eventually had to undergo a surgical revision of the tracheostomy. Approximately five minutes elapsed from the time of Mr. Smith's obstruction until the time an airway was established. This acute hypoxic episode, or oxygen deprivation, caused irreversible brain damage.

Two expert witnesses also testified regarding Dr. Henderson's negligence. Dr. Willis Parmley, a board-certified specialist in emergency room medicine, testified that a patient presenting symptoms such as Mr. Smith presented should cause an emergency room physician to be concerned about the possibility of an acute infectious process in the back of the throat. The physician's concern should be to ensure that the patient does not have swelling in the upper airway that will endanger the air flow to the lungs. Dr. Parmley stated that good and accepted medical practice requires a doctor presented with those symptoms to consider a diagnosis of epiglottitis, and that, if epiglottitis is a possible diagnosis, the patient should be considered a medical emergency because of the danger of obstruction of the airway. Dr. Parmley testified that because of that possibility, Dr. Henderson should have taken steps to evaluate the supraglottic airway, including an evaluation of the epiglottis, the posterior pharynx, and larynx. He also noted that a physician can investigate with an indirect laryngoscope to determine whether there was an infection or swelling in those structures. Dr. Parmley also testified that the patient should be seen by an ENT specialist, because such physicians normally treat epiglottitis.

Dr. Bartlett, a physician and professor of medicine from California with extensive experience in surgical and emergency room settings, principally criticized Dr. Henderson for failing to timely establish an airway for a patient in respiratory arrest. His opinion was based on the understanding that it took seven minutes between the time of the patient's complete airway obstruction and the delivery of oxygen into the trachea. This was based on the fact there was a two-minute delay on the decision to do a tracheostomy, and five more minutes passed before the tracheostomy was complete and oxygen was delivered to the trachea. Dr. Bartlett's estimate of the two-minute delay was derived from testimony in Dr. Henderson's deposition and is consistent with the record which shows that a respiratory therapist arrived in the emergency room in response to a "Code Blue", prior in time to Dr. Henderson's arrival to start the tracheostomy.

Dr. Henderson's technique of taking time to ligate, or tie off, blood vessels during surgery, rather than establishing an airway first, as indicated in the nursing notes, was also criticized by Dr. Bartlett. Because Mr. Smith was improperly restrained, Dr. Bartlett criticized Dr. Henderson's performance of the tracheostomy on "a moving target", which resulted in an irregular incision, a lacerated jugular vein, and profuse bleeding which prevented the doctor from seeing what he was doing.

Additionally, Dr. Bartlett criticized the fact that sodium bicarbonate was not administered to Mr. Smith immediately after

his cardiac arrest, but was given for the first time thirty minutes after the arrest. He testified that the physician in the emergency room is in charge of keeping the resuscitative effort organized by telling the support staff what to do, but that Dr. Henderson failed to perform that function properly in a resuscitation effort which Dr. Bartlett characterized as "disorganized" and not well run, with misdirected priorities.

In response, BMHS complained that Dr. Bartlett did not testify that he was familiar with the standard of care for emergency room physicians in San Antonio in 1980 and that his assumption was incorrect that it took seven minutes to establish a tracheostomy. BMHS did not challenge the admission of Dr. Bartlett's deposition testimony on the basis he was not qualified to render an opinion in this case, nor did it suggest that the standard of care was different in San Antonio than in any other part of the country. In fact, BMHS urged that certain elements of Dr. Bartlett's testimony were admissible because the standard of care was one of "uniformity" and was "identical to how medicine is practiced nationally." Regarding the attack on Dr. Bartlett's "assumption" it took seven minutes to perform the tracheostomy, it is apparent that he concluded based on the medical records and other deposition testimony that it took two minutes to begin the tracheostomy after the obstruction occurred and another five minutes to perform the tracheostomy, which is entirely consistent with other evidence before this court.

BMHS presented no witnesses and rested at the conclusion of the plaintiffs' case. The only expert called by Dr. Henderson to render an opinion on the negligence allegations was Dr. William Hills, a social friend of Dr. Henderson's, who admitted he had agreed to testify for Dr. Henderson even before he ever examined the medical records in the case. Moreover, Dr. Hills' opinion was predicated on the fact that Mr. Smith had an allergic reaction to penicillin, rather than epiglottitis. Dr. Hills agreed that if Mr. Smith did not have an allergic reaction, he would have to change his opin-ion. BMHS did not comment on Dr. Hills' testimony in its brief.

There is no question that the great weight and preponderance of the evidence regarding Dr. Henderson's alleged negligence supports the jury's finding, and the jury's finding was certainly not so clearly wrong and unjust as to justify reversing the jury verdict. The eighth point of error is overruled.

Having overruled each of appellant's eight points of error, and having refused to order remittitur under the facts of the instant case, we, therefore, decline to entertain appellee's counterpoint that the relief of remittitur should not be available to a party that has failed to enter into good faith settlement negotiations prior to perfecting an appeal, in view of the dearth of support for such an argument in the record before us.

The judgment of the trial court is affirmed.