Richard NAIRN, Plaintiff-Appellee,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION,**
Defendant-Appellant.

**No. 182, Docket 87-7435.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1987.

Decided Jan. 20, 1988.

Charles C. Goetsch, New Haven, Conn. (Cahill, Goetsch & DiPersia, P.C., of counsel), for plaintiff-appellee.

Charles A. DeLuca, Stamford, Conn. (Ryan, Ryan & Hickey, of counsel), for defendant-appellant.

Before LUMBARD, KEARSE and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

The National Railroad Passenger Corporation ("the Railroad") appeals from an order of the United States District Court for the District of Connecticut, Warren W. Eginton, Judge, refusing to grant a new trial due to excessiveness of the jury verdict in a case brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* The plaintiff, Richard Nairn ("Nairn"), suffered a permanent back injury while performing his job as a construction foreman, which he alleged was caused by the Railroad's negligence. The jury found in favor of Nairn and awarded him damages in the amount of $765,000. After a careful review of the evidence in this case, we conclude that this is one of those rare instances where the jury's verdict was excessive as a matter of law. Accordingly, we vacate the judgment and remand for a new trial on the issue of damages.

## BACKGROUND

At the time of his injury, Nairn was employed by the Railroad as foreman of a construction and repair crew in New Haven, Connecticut. He was 33 years old and married with four children. On the morning of December 26, 1984, Nairn injured his back while attempting to lift a piece of heavy equipment which had become embedded in ice. Nairn continued working that day, but when the pain did not subside, he went to the emergency room of a local hospital. He was advised to go home and rest, and to consult an orthopedic specialist if the pain persisted.

Nairn continued to experience pain, and on January 7, 1985, Nairn had the first of a series of appointments with Dr. DePonte, his family's orthopedic surgeon. Dr. DePonte ordered several tests to be performed, including x-rays, a CAT scan, and a myelogram; all the results were normal. Nairn attempted to return to work one day

during January, but after driving in a truck for a couple of hours, was in so much pain that he had to return home.

In March 1985, Nairn consulted a neurologist, Dr. Robinson, who diagnosed Nairn as having a "musculoligamentous strain" and advised him to return to work. Nairn worked from mid-March until the end of June 1985, although his back pain persisted. On June 28, 1985, Nairn re-injured his back while shoveling wet sand at a construction site. After this he quit working once again. In July 1985, Nairn visited Dr. Robinson, who suggested that Nairn undergo a Magnetic Resonance Image ("MRI") test. The MRI results showed a "slight decrease in signal at the L5–S1 disc space," the first positive test finding since Nairn's original injury. Dr. Robinson interpreted the MRI results as evidence of mild disc degeneration.

Nairn then began a course of physical therapy, but discontinued it when he failed to improve. In the fall of 1985, Dr. DePonte advised Nairn that he had a permanent partial disability and would be unable to return to his former job with the Railroad. Dr. DePonte assessed Nairn as having a permanent back function impairment of 15%.

Once Nairn learned that his disability was permanent, he began to contemplate litigation against the Railroad. He commenced the instant FELA action in October 1985, seeking one million dollars in damages. On the advice of his attorney, he consulted Dr. Taub, a specialist in chronic pain, on February 3, 1986. Dr. Taub studied the results of the MRI test and concluded that there was "moderate-to-marked" dessication of the intervertebral disc space at the L5–S1 level. Dr. Taub diagnosed Nairn as having suffered a "lumbosacral sprain productive of intervertebral disc derangement." Dr. Taub agreed with Dr. DePonte's assessment of a 15% permanent back impairment, and suggested that Nairn seek employment at the "medium duty" level, which would entail lifting no more than 50 pounds.

In February 1986, one of Nairn's friends offered him a general maintenance position at an apartment complex. Nairn accepted this position, where he worked as an independent contractor and was able to set his own hours. At the time of trial, Nairn was working approximately 32–40 hours per week at a salary of $10.25 per hour, with no benefits. Nairn's salary at the Railroad had been $11.85 per hour with very good benefits.

In May 1986, Nairn visited Dr. Taub again, after tripping in a parking lot. At that time, Dr. Taub advised Nairn to restrict his employment to "light duty" work. Nairn's job at the apartment complex was consistent with this recommendation.

Nairn's suit against the Railroad was tried before a jury on February 10 through 13, 1987. Dr. Taub testified as Nairn's medical expert, summarizing Nairn's medical history following the injury. Dr. Goodman, testifying as the Railroad's medical expert, concluded that Nairn had only a 5% functional impairment. Various Railroad employees testified about the condition of the construction yard where Nairn was injured. Nairn himself testified as to the circumstances of his injury, his course of medical treatment, and the restrictions on his activities which he was forced to endure as a result of his partial disability.

The jury found that the Railroad was negligent in maintaining its equipment storage yard and that this negligence caused Nairn's injury. The jury returned a verdict in favor of Nairn in the amount of $765,000. The Railroad moved for a new trial on several grounds, including excessiveness of the verdict. Judge Eginton denied the motion without opinion.

## DISCUSSION

The only issue which the Railroad raises on appeal is the amount of the verdict. A jury verdict is not, certainly, something lightly to be set aside. A district court's refusal to grant a new trial on the ground of excessiveness of the verdict may only be overturned for abuse of discretion. *See Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 750 (2d Cir.1984); *Batchkowsky v. Penn Central Co.,* 525 F.2d 1121, 1124 (2d Cir.1975).

As a reviewing court, we are not permitted to vacate or reduce a jury award merely because we would have granted a lesser

amount of damages. Rather, "we may order a new trial only when the verdict is irrational or so high as to shock the judicial conscience, rendering it an abuse of discretion not to set it aside." *Batchkowsky*, 525 F.2d at 1124; *see also Dagnello v. Long Island Rail Road Co.*, 289 F.2d 797, 806 (2d Cir.1961) (appellate court may only set aside verdict where it would be a "denial of justice" to let it stand).

In order to determine whether a district court abused its discretion by refusing to order a new trial on damages, the appellate court must make its own "detailed appraisal of the evidence bearing on damages." *Grunenthal v. Long Island Rail Road Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968). We proceed, then, to analyze the damages evidence in Nairn's case.

■ The damages award consisted of compensation for lost income and pain and suffering. Medical expenses were not included because the Railroad had paid all of Nairn's medical expenses. It was stipulated that the after-tax value of Nairn's Railroad job, including benefits, was approximately $32,277 per year. Nairn had received regular annual wage increases. Prior to starting work at the apartment complex, Nairn had $16,922 in lost wages. It was further stipulated that Nairn's work-life expectancy was 26.5 years and that his life expectancy was 37.7 years.

When Nairn began working at the apartment complex, his rate of pay was $8.50 per hour. This was subsequently increased to $10.25 per hour. Nairn testified that he did not expect any substantial wage increase in the forseeable future but offered no evidence as to why this would be so. At the apartment complex, Nairn worked as an independent contractor and did not receive benefits such as medical insurance or a pension plan. He had made no attempt to seek comparable employment which would offer such benefits. At first Nairn worked a limited number of hours at his new job, but by the time of trial, he was working between 32 and 40 hours per week.

Nairn calculated his current average weekly income to be approximately $337. At this rate of pay, the after-tax value of his apartment complex job would be approximately $16,300 per year, or approximately $15,980 less than the value of his Railroad job.

Nairn did not offer expert testimony regarding the present value of his future lost earnings, nor did his counsel suggest any numbers to the jury. The jury was instructed to apply a 2% discount rate to its award. If the jury accepted Nairn's estimate of his current income, adopted the work-life expectancy of 26.5 years, and followed the judge's instructions regarding the discount rate, then it is likely to have awarded no more than $350,000 for past and future lost earnings. This would leave at least $400,000 of the award for pain and suffering.

The medical experts agreed that Nairn had suffered a lumbosacral strain which produced a certain degree of disc degeneration. At most, Nairn had a 15% impairment of back function. Other than his initial visit to the emergency room, he had never been hospitalized or required surgery. Nairn had clearly experienced a great deal of pain, however, and continued to have his good days and bad days up to the time of trial. Although he was relegated to light-duty work, and could not sit for prolonged periods, his capacity for working had increased significantly over the course of the year preceding trial.

Both Nairn and his wife testified that prior to the injury, Nairn had enjoyed a variety of athletic activities and hard physical labor. He particularly enjoyed spending time with his children. Following the injury, he could no longer engage in sports, teach sports to his children, or "roughhouse" with them. He could no longer perform household chores such as chopping wood, gardening, and shoveling snow. His wife testified that Nairn's relationship with both her and the children had become more distant since the accident, and that he was "depressed." Nairn felt that his life generally had taken a turn for the worse.

As for Nairn's prognosis, the degenerative disc condition is not curable. Dr. Taub testified that he would expect to see Nairn several times a year during the next five to ten years "and then gradually, the disc will provide very little difficulty" unless there was further trauma to it.

In order to determine whether a particular award is excessive, courts have found it useful to review awards in other cases involving similar injuries, while bearing in mind that any given judgment depends on a unique set of facts and circumstances. *See, e.g., In re Air Crash Disaster Near New Orleans, La.,* 767 F.2d 1151, 1156–57 (5th Cir.1985); *Martell,* 748 F.2d at 752–53.

Two recent cases from the Third Circuit involved injuries similar to Nairn's. In *Gumbs v. Pueblo International, Inc.,* 823 F.2d 768 (3d Cir.1987), the plaintiff injured herself after slipping on spilled oil in a supermarket. After the injury, she had trouble with household chores and found sexual relations too painful. She could no longer engage in outdoor activities or dancing and had difficulty playing with her children. Ultimately, her marriage broke up. Like Nairn, Gumbs had never been hospitalized; unlike Nairn, she had not missed any work. The court vacated an award of $575,000 for pain and suffering as excessive, and ordered a new trial unless plaintiff agreed to remit damages in excess of $235,000.

In *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030 (3d Cir.1987), a 38 year old pipefitter injured his back after falling at a construction site. Plaintiff's injury was somewhat less severe than Nairn's, with fewer clinical signs. Williams continued to have pain following the injury, could no longer dance, and could not sit for long periods. He lost at least 40% of his earning capacity and could no longer perform his former job. The court held that a jury verdict of $600,000, of which approximately $317,000 represented pain and suffering, was excessive, and ordered a new trial unless plaintiff agreed to remit pain and suffering damages in excess of $100,000.

In another recent case, *Harper v. Zapata Off-Shore Co.,* 741 F.2d 87 (5th Cir. 1984), a seaman fell down a flight of stairs, resulting in back injury more serious than Nairn's. Harper required surgery on two occasions for ruptured discs. He had continuing pain in his back and legs, and had trouble sleeping. One of his doctors estimated that Harper's minimum impairment was 30%, and the jury could have concluded that he would not work again. The Fifth Circuit held that the jury award, which included at least $485,000 for pain and suffering, was excessive. A new trial was ordered unless Harper remitted $200,000 of the award.

Other recent damage awards include *Borough v. Duluth Missabe & Iron Range Ry. Co.,* 762 F.2d 66 (8th Cir.1985) ($309,-024 in FELA suit for medical expenses, lost income and pain and suffering related to lower back injury); *Hintz v. Jamison,* 743 F.2d 535 (7th Cir.1984) ($250,000 for back injury requiring surgery and neurological injury causing bladder and bowel dysfunction); *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110 (5th Cir.1984) ($412,098 for pain and suffering and lost income relating to back injury which required surgery).

In *Gumbs,* 823 F.2d at 773, the Third Circuit noted that appellate courts have become increasingly willing to review damage awards:

> There is no doubt that this trend is a response to the increasingly outrageous amounts demanded by plaintiffs and awarded by juries. A jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.

*Id.*

Our review of these and other cases, as well as our independent examination of the facts in this case, leads us to agree with the Railroad that the jury's verdict was excessive. We do not mean to belittle Nairn's pain and disappointment at no longer being the active, athletic man he once was, or to minimize the very real impact of the injury on Nairn's life and lifestyle. We conclude, however, that an award for pain and suffering of at least $400,000 for a 15% functional impairment is one that "shocks the judicial conscience."

We therefore vacate the judgment and remand the case for a new trial on the issue of damages.

KEARSE, Circuit Judge, dissenting:

With due respect, I dissent from the majority's decision to vacate the jury verdict

and remand for a new trial. While I do not disagree that a verdict of $400,000 for pain and suffering for a back injury of the type shown here would be out of line with awards for this type of injury in other cases, the majority's view that $400,000 of the $765,000 verdict was for pain and suffering rests on assumptions that cannot be verified, while other assumptions justifying the verdict are permissible.

The majority's $400,000 figure is based on the assumptions that the jury calculated plaintiff Richard Nairn's lost future earnings by projecting his earnings from defendant National Railroad Passenger Corporation ("Railroad"), less his earnings from his new employment, over a period of 26.5 years, and that in calculating the present worth of those lost future earnings it used a discount figure of 2%:

> If the jury accepted Nairn's estimate of his current income, adopted the work-life expectancy of 26.5 years, and followed the judge's instructions regarding the discount rate, then it is likely to have awarded no more than $350,000 for past and future lost earnings. This would leave at least $400,000 of the award for pain and suffering.

Majority Opinion *ante* at 567. This hypothesis does not take into account either the flexibility that the trial court's instructions allowed the jury or evidence favorable to Nairn that may well have influenced the jury to award considerably more than $350,000 for economic loss.

For example, the trial court did not instruct the jurors that they *must* proceed on the assumption that Nairn would have worked only 26.5 years longer, *i.e.*, till age 61.5; it gave them that figure as a statistical average and told them "you *may* rely" on the actuarial statistics, stating that the statistical average "is only one element for you to consider. You may also consider and should consider ... any other evidence which you heard which in your judgment reasonably indicates his probable length of life and his work life." (Trial Transcript dated February 13, 1987 ("Tr."), 99–100; emphasis added.) Given the evidence that before being injured Nairn had been in excellent physical condition, the jury could have, instead of woodenly accepting that Nairn's work life would be of average length, found that Nairn would work past the age of 61.5, thereby giving him more than 26.5 years of lost future earnings.

Nor did the court instruct the jurors that they *must* use 2% as their discount figure. Rather, it described the 2% figure as "a good guideline," "a" way in which the jury could balance present discounted value with the effects of inflation (Tr. 102), stating "you *may* consider that the interest rate traditionally has been 2% higher than inflation," and stating that "your experience, common sense and judgment shows you that inflation rates are indeed variable" (Tr. 103; emphasis added). Throughout the charge, the court advised the jury to use its common sense and judgment to estimate what amount would be required to make the plaintiff whole. Thus, consistent with the trial court's instructions and with the law, *see, e.g., Woodling v. Garrett Corp.*, 813 F.2d 543, 558–59 (2d Cir.1987) (upholding instruction that jury was to determine what rate was appropriate and stating that rates of 1.5% to 2% would not be inappropriate), the jury could easily have used a 1.5% discount factor, thereby increasing the award for future lost earnings to a significantly greater sum than that assumed by the majority.

Further, nothing in the trial court's instructions or in the evidence required the jury to assume that, had Nairn remained uninjured and employed by the Railroad, he would have been moored at his most recent salary for the balance of his working life. Nairn, a 33–year-old at the time of his injury who had been employed by the Railroad since his mid–20's, testified that he had intended to make the Railroad his career. He was a member of a labor union, he had received regular wage increases, and he had been promoted from carpenter to foreman after working for the Railroad for three years. The Railroad employee who had been Nairn's supervisor testified that Nairn had been an excellent worker and one of his better foremen. The jury could easily have found on the basis of this evidence that Nairn would likely have received further wage increases had he not been injured and forced to leave the employ of the Railroad. *See, e.g., Grunenthal v. Long Island Rail Road Co.*, 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968) (jury entitled to take into account evidence of past steady wage increases and the strong likelihood that similar increases would continue).

Thus, I note at least three variables as to which the majority has made assumptions that the jury was not required to adopt: retirement at age 61.5, a 2% discount rate, and a stagnant salary. Adopting reasonable differences in one or all of these variables—all consistent with the trial court's instructions and with the evidence—yields economic-loss figures well in excess of the figure assumed by the majority, and, of course, a correspondingly lower figure for pain and suffering. For example, the jury may have used a 26.5-year work-life expectancy and a 2.0% discount rate (both as assumed by the majority) but found, based on the evidence and its common sense, that Nairn would have received salary increases had he remained with the Railroad. If the jury found he would have received only very modest increases of 2–3% per year, both in the Railroad job (with no promotions or large raises) and in his new (nonunionized) employment (*see* U.S. Dep't of Labor, Bureau of Labor Statistics, *Monthly Labor Review*, Nov. 1987, at 66 (showing annual salary increases for transportation workers from 1979 through 1986 ranging from 2% to 9%, with an average for that period of 5–6%); *see also* U.S. Dep't of Commerce, Bureau of the Census, *Statistical Abstract of the United States 1987*, at 400 (showing annual salary increases for nonfarm business workers from 1980 through 1985 ranging from 4% to 10.5%, with an average for that period of 6–7%)), its award for lost earnings, past and future, could have been $479,000, rather than the $350,000 assumed by the majority.

Or, if the jury used a 2% discount rate but found that Nairn would have worked until age 65, receiving salary increases of 1–3%, its award for economic loss could have been $531,000.

Or, if the jury found that Nairn would have worked until age 65, receiving 1–3% salary increases, and if it used a 1.5% discount rate to calculate the present worth of those future earnings, its award for economic loss could have been $573,000.

Under any of these reasonable hypotheses, the jury's award for economic loss would have been in the range of $479,000 to $573,000, and its award for pain and suffering thus would have been in the range of $286,000 to $192,000, sums within the permissible range according to the cases discussed by the majority.

We cannot know precisely, of course, how the jury arrived at its overall verdict of $765,000, for with respect to damages it was asked only the general question, "What amount do you find, without reduction for contributory negligence, will fairly and adequately compensate the plaintiff for all damages stemming from the incident of December 26, 1984?" Our obligation under the Seventh Amendment is to uphold the jury's award if there is a reasonable basis on which to do so. *See, e.g., Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1047 (5th Cir.1970), *appeal after remand,* 456 F.2d 180, *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *cf. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("[A] search for one possible view of the case which will make the jury's finding [unreasonable] results in a collision with the Seventh Amendment.").

Given the various possibilities as to how the jury could reasonably have awarded as little as $192,000 for pain and suffering, I cannot conclude that the district court abused its discretion in refusing to set aside the verdict as excessive. I would affirm the judgment.