Opinion issued April 26, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-01025-CV

———————————

Marquette Transportation Company Gulf-Inland, LLC, Appellant

V.

Lorne
Jackson, Appellee



 



 

On Appeal from the 55th District Court

Harris County, Texas



Trial Court Case No. 2009-16642

 



 

MEMORANDUM OPINION

          Lorne
Jackson, appellee, sued the appellant, Marquette Transportation Company
Gulf-Inland, LLC (“Marquette”), under the Jones Act for personal injuries he
sustained while employed on one of Marquette’s vessels.  Following a bench trial, the trial court
entered judgment in Jackson’s favor.  In
three issues, Marquette argues that (1) the evidence and findings of fact do
not support the conclusion that Marquette and its pilot were negligent; (2) the
evidence conclusively established that Jackson was negligent; and (3) the
findings of damages for pain and mental anguish, future medical expenses,
physical impairment, and physical disfigurement are not supported by factually
sufficient evidence.

          We affirm.

Background

          Marquette
hired Jackson in January 2009.  Jackson
subsequently received approximately ninety minutes of training, including
watching a training video on the safe handling of lines and an hour of
classroom training.  Jackson also
received on-the-job training for several weeks aboard Marquette marine
vessels.  On February 18, 2009, Marquette
assigned Jackson to the St. Andrew, a push boat, where he sustained his injury
ten days later.  Jackson sued Marquette
for negligence under the Jones Act for his personal injury.  See 46
U.S.C. § 30104.Jackson
also alleged that the St. Andrew and its crew were unseaworthy.  However, the trial court found that the
vessel and crew were seaworthy, and this determination of the trial court is
not challenged on appeal.

At trial, the evidence revealed
that, on the evening the injury occurred, it was dark or “pitch black” on the
deck of the barge.  Jackson and pilot
John King were the two crew members on duty, and King was the officer on duty.  Two other crew members, Captain Carl Royce
and First Mate John Bartholomew, were off duty, and Bartholomew was sleeping
below deck.  At this time, Jackson had
been a Marquette employee for a little more than a month, and it is undisputed
by the parties that Jackson was an inexperienced, “greenhand” seaman.  

The St. Andrew received
instructions to retrieve a barge from a dock at the Houston Ship Channel and
transport it to a nearby staging area. 
The barge was moored to the dock by six mooring lines, and King assisted
Jackson in “facing up” the St. Andrew to the barge and removing five of the
lines mooring the barge to the dock with no problems.  At some point, King left the deck of the
barge to return to the wheelhouse on the St. Andrew, leaving Jackson on the
deck of the barge by himself, in spite of Marquette’s policy providing, “If
possible, never go on the tow alone at night.”Jackson attempted to remove the
last mooring line—a rope approximately 75 feet long and three inches in
diameter—but he was unable to do so because the line was “fouled” on the
timberhead—the post where the mooring line was attached at the dock.    

King testified that before he left
the barge he told Jackson that he would have to return to the St. Andrew before
the last line was removed so that he could steer the boat.  He testified that he told Jackson to try to
remove the final line the same way they had removed the first five, and if he
could not do that, they would try something else.  He testified that, from his position in the
wheelhouse, he could see Jackson on the deck of the barge, but he could notsee
Jackson’s lower body, which was apparently obscured by piping.  He saw that Jackson was unable to remove the
line, and when Jackson appeared to try to climb up onto the dock, King told him
over the radio to stop, based on a concern that Jackson might fall between the
dock and the barge.  King testified that
he told Jackson “to put the eye back on the cavel[1] . . . and that I would pull
it free with the boat, to just stand back and get out of the way and I’ll move
it.”  He testified that Jackson returned
the eye back to the cavel and backed away to a location that appeared to be
free of the line.  

Jackson, in contrast, testified
that King told him only that he was going back to the wheelhouse, but he did
not say anything else about what was going to happen.  Jackson testified that he was confused about
the process of removing the mooring lines, and he did not understand what King
was trying to do.  He testified that he
communicated with King over the radio, and King told him that he was moving the
St. Andrew, which, at that time, Jackson did not realize was attached to the
barge—he thought the St. Andrew was attached to the dock.  Jackson testified that he did not know that
the line was going to move and that he never received any instructions from King
to stand clear of the line, which was about 75 feet long.  It is undisputed that the barge was
approximately 54 feet wide.  Edward
Webster, an expert on liability who testified on Jackson’s behalf, testified
that the amount of rope was significant “because 50 feet [of rope] just not
even coiled up and laying on the deck fills a pretty large area of that deck
space” and because the length made the rope more likely to “snag the
timberhead.”  He testified that a few
feet of the rope would have been looped in a figure eight around the cavel, but
the rest would have been splayed out on the deck in the forward area where
Jackson was standing.

As King used the St. Andrew to
attempt to move the final line, the line moved suddenly andJackson’s left leg
became tangled in the line and was severely injured.  Jackson testified that the “line came quick
and it . . . hooked my boot” and pulled him into the cavel where the line was
looped on the barge’s deck.  Jackson
testified that he did not run after the line to try to catch it, but instead,
the line was pulling him.  King, on the
other hand, testified that when the barge started moving, Jackson “began to run
towards the dock itself.  It appeared
that he was taking off running.”  At that
point, King ordered Jackson over the radio to not “chase the line” and then saw
him collapse and lost sight of his body.

Less than a week after Jackson’s
injury, Marquette filed a “Report of Marine Accident, Injury, or Death” with
the United States Coast Guard.  This
report stated that as King, the pilot, was attempting to pull the line free
from the dock, he “looked up to the bow of the barge and it appeared that
[Jackson] had become entangled in the line and could not get free.  While pulling away from [the] dock the line
tightened and drew [Jackson’s] left leg toward the cavel,” resulting in severe
injury to Jackson’s left knee and lower leg. 
That report also stated that King “was unable to see the accident due to
the piping on the barge obstructing his view.” 
This report contains no mention that Jackson failed to follow King’s
instructions, nor does it indicate that Jackson “chased” the line.

Regarding his injury, Jackson
testified that he realized he was injured when he hit the cavel on the barge
deck.  He experienced “excruciating
pain,” “pain like [he had] never felt before in [his] life.”  Shawn Best, a deck mate on another ship who
came to Jackson’s aid, described Jackson’s injuries immediately following the
accident: he stated that he could “see that [Jackson was] in pain,” that “his
foot was hanging off of his leg at . . . a 90-degree angle,” and that there was
“blood everywhere.”  Jackson and Dr.
Lionberger, one of Jackson’s treating physicians and expert witnesses,
testified regarding the extent of Jackson’s injuries and the numerous surgical
procedures Jackson required as a result. 
Jackson, Lionberger, Jackson’s mother, and Marquette’s medical expert,
Dr. Sassard, among others, all testified regardingthe nature and extent of
Jackson’s injury and subsequent recovery.

          The
trial court made the following findings of fact, among others:

Pilot
John King (“King”) was an employee of Marquette and the presiding officer of
the operation at the time of the accident.

          On February 28, 2009, Jackson had been on the job 37
days.  Jackson was a “greenhand” or
inexperienced seaman.

          Captain Carl Royce and Deck Mate John Bartholomew were on
board.  They were both in their quarters
and Bartholomew was asleep.

          King did not wake up Bartholomew to assist Jackson on the
barge.

          Sunset on the day of the accident was 6:20 p.m.  The accident happened at 6:45 p.m.

          On the deck of the barge it was “night,” “dark” or “pitch
black.”

 

. . . .

 

          King left Lorne Jackson alone on the deck of the barge at
night while he returned to the wheelhouse and Jackson attempted to free the
sixth, or last line on the barge. . . .

          At the time of the accident King was in the wheelhouse 240
feet away from Jackson on the deck of the barge.  Pilot King was in visual contact with
Jackson, but could not see his legs or feet. 
Pilot King was in verbal contact with Jackson through a walkie-talkie. .
. .

          When King left Jackson on the deck of the barge, he did not
know the line was fouled and could not be removed from the timberhead.  After Pilot King returned to the wheelhouse
he decided to free the line by moving the barge away from the dock.

 

. . . .

 

King
instructed Jackson to release the line from the cavel and he would pull the
long end around the timberhead on the dock. . . . 

          When King started to pull away from the dock, Jackson was
positioned in the center of the bow of the barge.

          This was the first time Lorne Jackson performed this
operation.

          Jackson appeared to chase the line.

          Jackson’s foot was caught in the line dragging his left leg
under the barge’s cavel causing injury.

 

. . . .

 

Jackson
was taken by ambulance to the nearest hospital and transferred to Memorial
Hermann where he had surgery to repair a Grade IIIA open fracture of the left
distal tibial diaphysis with open reduction and application of an external
fixator.

          Jackson has had six surgeries to date on his left leg which
resulted in reconstruction of the left leg and ankle with right latissimusdorsi
free flap, dissection of posterior tibial vessels and split thickness skin
graft.

          Jackson suffered a degloving of his lower left leg.

          Jackson has a permanent malrotation of his left ankle.

          Jackson will likely suffer injury to his left knee over
time.

          Jackson continues to suffer from lymphedema which leads to
swelling and pain in his lower leg.

          Jackson’s lower left leg shows significant scarring.  Jackson has scarring on his upper leg and
side from skin and muscle harvesting.

          Jackson cannot stand or walk for more than one hour a day.

 

          The
trial court concluded that Jackson was a Jones Act seaman employed by Marquette
working in the scope of his duties at the time of his injury, that “Marquette
and King were negligent on February 28, 2009 and their negligence was a
producing cause of injury to Lorne Jackson,” and that “Jackson was not
negligent” and “acted as a reasonable and prudent seaman under the
circumstances.”  The trial court also
concluded that “Jackson suffered pain and mental anguish in the past and, in
reasonable probability, will suffer pain and mental anguish for the rest of his
life,” that he “suffered permanent injuries including disfigurement and
physical impairment,” and that his “injuries resulted in past medical care and,
in reasonable probability, will require future medical care.”  

          The
trial court entered judgment in favor of Jackson, awarding him $4,162,176.40 in
total damages against Marquette.  The
trial court’s judgment provided that this amount included $1 million for past
physical pain and mental anguish, $500,000 for future physical pain and mental
anguish, $500,000 for past disfigurement, $500,000 for future disfigurement,
$500,000 for past physical impairment, $500,000 for future physical impairment,
and $225,000 for future medical expenses.[2]

Negligence

          In
its first issue, Marquette argues that the evidence and the trial court’s
findings of fact do not support a conclusion that Marquette and its pilot,
King, were negligent.  Specifically,
Marquette argues that the Jones Act does not require Marquette to ensure an
employee’s safety, and, thus, Jackson had the burden to prove that Marquette
and King acted negligently.  It argues
that the findings made by the trial court and the evidence presented at trial
do not support a legal conclusion that Marquette and King breached any duty
owed to Jackson.  In its second issue,
Marquette argues that the evidence conclusively established that Jackson was
negligent.

A.      Standard
of Review

          The
Jones Act provides a cause of action for maritime workers injured by an
employer’s negligence.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 405 (Tex. 1998); Diamond Offshore
Mgmt. Co. v. Horton, 193 S.W.3d 76, 78 (Tex. App.—Houston [1st Dist.] 2006,
pet. denied).  Federal law provides that
a party asserting an admiralty action may bring the action in state court.  Ellis,
971 S.W.2d at 405–06; Horton, 193 S.W.3d at 78; see 28 U.S.C. § 1333(1) (2000).  When a state court hears an admiralty case,
that court occupies essentially the same position occupied by a federal court
sitting in diversity: the state court must apply substantive federal maritime
law but follow state procedure.  Ellis, 971 S.W.2d at 406; Horton, 193 S.W.3d at 78.

          A
fundamental duty of a Jones Act employer is to provide its seamen employees
with a reasonably safe place to work.  Noble Drilling (US) Inc. v. Fountain,
238 S.W.3d 432, 439 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing Colburn v. Bunge Towing, Inc., 883 F.2d
372, 374 (5th Cir. 1989)).  The proper
standard for determining the duty of care owed by an employer or a seaman is
ordinary prudence under the circumstances. 
Id. (citing Offshore Pipelines, Inc. v. Schooley,
984 S.W.2d 654, 658 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (citing Gautreaux v. Scurlock Marine, Inc., 107
F.3d 331, 335, 339 (5th Cir. 1997))). 
The circumstances of a seaman’s employment include not only his reliance
on his employer to provide a safe work environment but also his own experience,
training, or education.  Id. (citing Gautreaux, 107 F.3d at 339). 
Thus, the reasonable person standard applies, and the standard in a
Jones Act negligence action “becomes one of the reasonable seaman in like
circumstances.”  Id. (quoting Gautreaux,
107 F.3d at 339).

          The
Jones Act expressly incorporates the Federal Employers’ Liability Act (“FELA”)
and the case law developing that statute, and thus the causation standard under
the Jones Act is the same as that under FELA. 
Ellis, 971 S.W.2d at 406; Horton, 193 S.W.3d at 79.  Under FELA, the causation burden is not the
common law proximate cause standard; rather, the causation burden is “whether
the proof justifies with reason the conclusion that employer negligence played
any part, even the slightest, in producing the injury for which the claimant
seeks damages.”  Ellis, 971 S.W.2d at 406; Horton,
193 S.W.3d at 79; see also Fountain,
238 S.W.3d at 439–40 (“Under
the Jones Act, a seaman is entitled to recovery if his employer’s negligence is
the cause, in whole or in part, of his injury.”) (citingGautreaux, 107 F.3d at 335). 
This burden has been termed “featherweight.”  Ellis,
971 S.W.2d at 406; Horton, 193 S.W.3d
at 79.  Thus, to prove negligence, an
employee must prove: (1) personal injury in the course of his employment;
(2) negligence by his employer or an officer, agent, or employee; and (3)
causation to the extent that his employer’s negligence was the cause “in whole
or in part” of his injury.  RigdonMarine Corp. v. Roberts, 270
S.W.3d 220, 226 (Tex. App.—Texarkana 2008, pet. denied) (citing Hernandez v. Trawler Miss Vertie Mae, Inc.,
187 F.3d 432, 436 (4th Cir. 1999) and Gautreaux,
107 F.3d at 335).

          In
addition to a less stringent burden of proof, the standard of appellate review
in Jones Act cases, as provided under FELA, is also less stringent than under
the common law.  Ellis, 971 S.W.2d at 406; Horton,
193 S.W.3d at 79.  The purpose of the
Jones Act standard of review is to vest the fact-finder with complete
discretion on factual issues about liability. 
Ellis, 971 S.W.2d at 406
(citing Rogers v. Mo. Pac. R.R. Co.,
352 U.S. 500, 506–07, 77 S. Ct. 443, 448–49 (1957) (discussing standard of
review under FELA, which was incorporated into Jones Act)); Horton, 193 S.W.3d at 79.  Once the appellate court determines that some
evidence about which reasonable minds could differ supports the verdict, the
appellate court’s review is complete.  Ellis, 971 S.W.2d at 406; Horton, 193 S.W.3d at 79; see also Davis v. Odeco, Inc., 18 F.3d
1237, 1243 (5th Cir. 1994) (holding that some evidence of “causal nexus”
between negligence and injury is all that is required to survive appellate
review of favorable verdict on Jones Act negligence claim).  We apply this less-stringent
standard rather than a traditional factual sufficiency review of a finding of
liability under the Texas “weight and preponderance” standard.  Ellis,
971 S.W.2d at 406; Horton, 193 S.W.3d
at 79.

B.      Marquette’s
Negligence

          Marquette
argues that the evidence and the trial court’s findings do not support its
conclusion that Marquette and King, the officer on duty at the time of the
accident, were negligent. 

The trial court found that King
left Jackson “alone on the deck of the barge at night” so that Jackson was
required to free the final mooring line by himself and that other,
more-experienced crew members were on board, although they were off duty.  The trial court also found that, at the time
he left the barge, King did not know that the final line was fouled on the
timberhead and that he decided after he returned to the wheelhouse to free the
line by moving the barge away from the dock.The trial court further found that King
was “in visual contact with Jackson, but could not see his legs or feet,” that
Jackson “appeared” to chase the line, and that Jackson’s “foot was caught in
the line dragging his left leg under the barge’s cavel causing injury.”

These findings are supported by the
evidence.  Jackson’s testimony indicated
that it was dark outside at the time of the incident, that he did not
understand the task he was asked to perform, and that King never gave him any
specific instruction about where to stand or what was about to happen.  Jackson testified that,although he was not
sure what was going to happen next, he understood that he was supposed to stay
out of the way for whatever was about to happen;that the “line came quick and
it hooked” his boot, pulling him into the cavel on the barge’s deck; and that
he did not run after the line to try to catch it, but, instead, the line pulled
him along the deck.  Jackson had moved to
mid-deck, or “the center of the bow”of the 54-foot barge.  According to Webster, approximately 50 feet
of the rope was splayed out over a “pretty large area” of the deck near where
Jackson was standing. King testified that he was 240 feet away from Jackson and
that his view of Jackson’s legs and feet was obscured.

Thus, the evidence and findings
support a conclusion that King and Marquette were negligent because King, in
spite of the fact that he could not see Jackson’s legs and feet,used the St.
Andrew to remove the final lineconnecting the barge to the dock while Jackson
was standing on the deck of the barge in proximity to the 50 feet of rope.  King, according to Jackson’s testimony,
failed to warn Jackson or provide any instruction or information regarding what
to expect and what Jackson needed to do to preserve his safety.  Furthermore,King failed to call another crew
member to assist Jackson with the unfamiliar maneuver, in violation of
Marquette’s policy that seamen should “never go on the tow alone at night” when
possible. See Fountain, 238 S.W.3d at
439 (holding that circumstances of seaman’s employment include not only his
reliance on his employer to provide safe work environment, but also his own
experience, training, and education, and that Jones Act employer has
fundamental duty to provide its seamen employees with reasonably safe
workplace). 

The evidence supports a conclusion
that (1)Jackson suffered an injury in the course of his employment;
(2) King, the officer on duty, was negligent in failing to properly warn
or instruct Jackson regarding the operation they were performing or in failing to
call another crew member to assist Jackson with the unfamiliar maneuver; and
(3) this negligence cause Jackson’s injury “in whole or in part.”  See
Roberts, 270 S.W.3d at 226.

We overrule Marquette’s first
issue.

C.      Jackson’s
Negligence

          Marquette
also argues that the evidence supports a conclusion that Jackson was negligent
as a matter of law.  Marquette relies on
King’s testimony that he told Jackson to stay out of the way of the line; the
training Jackson had previously received; and the trial court’s finding that
Jackson “appeared to chase the line” in spite of King’s warning.

          Jackson
did not dispute that he received ninety minutes of training before beginning
work with Marquette, which included a training video and approximately an hour
of classroom training, and that he received several weeks of on-the-job
training on other vessels before being assigned to the St. Andrew.  However, Jackson also testified that he was
not familiar with the procedure he and King were preforming when the accident
occurred and that he was confused about whether he was on the dock or the barge
and about whether the St. Andrew was connected to the barge or the dock.  He did not know what King was trying to do with
respect to removing the final mooring line, and he did not know what to expect
when King told him that he was going to move the barge.  He testified that King did not give him any
specific instruction or command about where to stand, what to do, or what to
expect.  Jackson’s testimony indicates
that he was attempting to “get out of the way [of] whatever was going to
happen,” but he did not know what was going to happen next, he was confused
about the process of removing the mooring lines, and he did not understand what
he and King were trying to do.  Jackson
stated that he did not chase the line, but that the 75-foot long rope “came
quick and it hooked” his boot and pulled him along the deck into the cavel.

Furthermore, the trial court found,
and neither party disputes, that Jackson was a “greenhand,” or inexperienced
seaman.  Thus, some evidence—in
particular, Jackson’s testimony—supports the trial court’s conclusion that Jackson
acted reasonably under the circumstances, given his experience, training, and
education.  See Fountain, 238 S.W.3d at 439; see also Stevens v. Seacost Co., 414 F.2d 1032, 1039 (5th Cir.
1969) (holding that shipowner was liable for negligence when inexperienced
seaman was injured as result of grabbing chain as ship’s captain hauled it in and
stating, “The seaman’s youth, unfamiliarity, and total lack of experience put a
heavier burden on the ship and relieved the victim of responsibility”); Davis v. Parkhill-Goodloe Co., 302 F.2d
489, 494 (5th Cir. 1962) (stating that shipowner has “a duty to warn in an
effective way of dangers not reasonably known . . . and a duty to take
effective action in the light of the particular condition—here inexperience and
ignorance of seagoing perils—of the particular seaman” in holding shipowner
negligent for failure to warn inexperienced seaman to wear life vest). 

Contrary to Marquette’s argument, the
trial court’s finding that “Jackson appeared to chase the line” does not
support a conclusion that the trial court believed that Jackson ran after the
line in an attempt to catch it.  Consistent
with Jackson’s testimony, Jackson could have “appeared” to chase the line
because he was being dragged by it.  We
interpret the trial court’s finding in a light favorable to its judgment.  See
City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).

Marquette also argues that “on day
one of his employment, a deckhand has enough training experience to stay clear
of a line.”  However, Jackson stated that
he did not know what King was attempting. 
He testifiedthat King’s only statement to himwas that King going to move
the St. Andrew, butJacksondid not realize the line would also move.  His testimony also indicated that he had
never participated in a maneuver like the one King was attempting at the time
of Jackson’s accident.  Thus, there was
some evidence about which reasonable minds could differ indicating that Jackson
did not have the training or experience to know to stay clear of the line.See Ellis, 971 S.W.2d at 406; Horton, 193 S.W.3d at 79.  As we have already discussed, the evidence
indicates that King decided to move the St. Andrew, using its engines, to
remove the line.  He did so when he knew
Jackson stood on the deck of the barge but without a clear view of Jackson’s
legs and feet.

Jackson’s testimony about the incident
and its surrounding circumstances provided evidence about which reasonable
minds could differ in support of the trial court’s conclusion that Jackson was
not negligent, and, thus, we defer to the trial court’s judgment.  See Ellis,
971 S.W.2d at 406; Horton, 193 S.W.3d
at 79.

We overrule Marquette’s second
issue.

Damages

          In
its third issue, Marquette argues that the evidence supporting the trial
court’s award of damages was based on insufficient evidence.  Specifically, it argues that the trial
court’s findings for pain and suffering, mental anguish, future medical expenses,
physical impairment, and past and future disfigurement were excessive.

A.      Standard
of Review

          Texas
courts of appeals have the power to review excessiveness of damages and to
order remittitur in FELA actions and, by implication, in Jones Act cases as
well.  Ellis, 971 S.W.2d at 406 (citing Sweet v. Port Terminal R.R.Ass’n, 653 S.W.2d 291, 294–95 (Tex. 1983)).  We must make our own “detailed appraisal of the
evidence bearing on damages.”  Id. (quoting Nairn v. Nat’l R.R. Passenger Corp., 837 F.2d 565, 567 (2d Cir.
1988)).

          The
standard of review for an excessive damages complaint is factual sufficiency of
the evidence.  Id.  We employ the same test
for determining excessive damages as for any factual sufficiency question.  Id.  When considering a factual sufficiency
challenge, we must consider and weigh all of the evidence, not just that
evidence that supports the verdict.  Id. at 406–07.  We can set aside the verdict
only if it is so contrary to the overwhelming weight of the evidence that it is
clearly wrong and unjust.  Id.at 407. We are not the fact-finder
and may not pass upon the witnesses’ credibility or substitute our judgment for
that of the fact-finder, even if the evidence would clearly support a different
result.  Id.  We review a trial
court’s findings of fact for factual sufficiency under the same standards we
apply in reviewing a jury’s findings.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).

          When someone suffers
personal injuries, the damages fall within two broad categories—economic and
non-economic damages.  Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 763 (Tex. 2003).Traditionally, economic damages are those that
compensate an injured party for lost wages, lost earning capacity, and medical
expenses, while non-economic damages include compensation for pain, suffering,
mental anguish, and disfigurement.  Id.  Damages
for physical impairment are another type of non-economic damages.  See id.

Courts of appeals should conduct a
review of each category of damages awarded, considering the evidence unique to
each category, to determine whether the award for that category is against the
great weight and preponderance of the evidence. 
Id. at 773.  If, considering the evidence unique to each
category, we determine that the award was against the great weight and
preponderance of the evidence, we then consider all of the overlapping
evidence, together with the evidence unique to each other category, to
determine if the total amount awarded in the overlapping categories is
factually sufficient.  Id.

B.      Damages
for Pain and Mental Anguish

          In
part of its third issue, Marquette argues that damages the trial courtfound for
pain and mental anguish, namely that Jackson sustained $1 million in damages
for past pain and mental anguish and $500,000 for future pain and mental
anguish, are excessive.

          In
reviewing the factual sufficiency of an award of damages for pain and
suffering, we give great discretion to the fact-finder in determining the
amount of damages it deems appropriate.  See Marvelli v. Alston, 100 S.W.3d 460,
482 (Tex. App.—Fort Worth 2003, pet. denied).To recover damages for mental
anguish, a plaintiff must introduce “direct evidence of the nature, duration,
and severity of [his] mental anguish, thus establishing a substantial
disruption in [his] daily routine” or evidence of “a high degree of mental pain
and distress that is more than mere worry, anxiety, vexation, embarrassment, or
anger.”  Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995).  The evidence must also justify the amount
awarded.  Saenz v. Fid.& Guar. Ins. Underwriters, 925 S.W.2d 607, 614
(Tex. 1996).  Damages for future mental
anguish are recoverable “if there is a reasonable probability that they will be
suffered in the future.”  Lubbock Cnty. v. Strube, 953 S.W.2d 847,
857 (Tex. App.—Austin 1997, pet. denied) (op. on reh’g).  Mental anguish can be established through
testimony from the injured party explaining how he felt and how his life was
disrupted.  Tagle v. Galvan, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004,
no pet.).

          Marquette
argues that, “[a]t most, the evidence shows that Jackson consciously
experienced intense pain for approximately 30 minutes on the day of the
accident,” and that Jackson only experienced pain “on and off” after the
accident.  Marquette cites the facts that
Jackson was not taking pain medication nine months after the accident and that
Jackson characterized his pain as mild and occasional following his final
surgery to support its contention that the findings on damages for past pain
were excessive.  Marquette further argues
that the evidence does not support the finding on future pain because Dr.
Lionberger testified Jackson’s pain would stop once the leg healed completely
in a couple of years and because “Jackson was experiencing no pain on June 18,
2010 and could bear full weight on his left leg.”

          Regarding
evidence of mental anguish, Marquette argues that Jackson did not present
sufficient evidence because neither his mother’s testimony that she was
concerned he was depressed nor evidence that Jackson worried about and dwelled
upon his injury demonstrated a “high degree of mental pain and distress that is
more than mere worry, anxiety, vexation, embarrassment, or anger.”  See
Woodruff, 901 S.W.2d at 444.  It
further argues that there was no evidence that Jackson is likely to experience
mental anguish in the future.

          The
record contains more evidence regarding Jackson’s physical pain and mental
anguish than the facts cited by Marquette. 
Shawn Best, who observed Jackson’s injuries immediately following the
accident, testified that he could “see that [Jackson was] in pain,” that “his
foot was hanging off of his leg at . . . a 90-degree angle,” and that there was
“blood everywhere.”  Jackson himself
testified that the pain he experienced at the time of the accident was
excruciating and unlike any pain he had felt before.  Jackson’s medical records indicated that he
reported feeling pain several hours after the accident despite attempts to
control it with morphine.  Jackson also
testified that he continued to experience painfrom the numerous surgeries that
occurred over the following months and that his leg still hurts him “every
day,” especially at night, when the pain sometimes keeps him awake.  He also stated that his leg occasionally
“swells up . . . like a watermelon” or a basketball and that the pain when it
swells is “excruciating.”  

Dr. Lionberger, the orthopedic
surgeon who was treating Jackson’s leg and who testified as a medical expert,
explained the severe nature of Jackson’s injuries.  The accident broke both of the bones in
Jackson’s lower left leg, in what Dr. Lionberger described as a grade three,
type A fracture—“the worst [type of] open fracture without contamination.”  Dr. Lionberger further testified that Jackson
suffered serious and extensive soft-tissue injuries to the surrounding tissues,
blood vessels, and skin on his left leg and that Jackson’s left knee had
multiple ligament tears.Dr. Lionberger testified about the extensive surgeries
that Jackson’s injury required in the two weeks following the accident,
including attachment of an external fixator to stabilize his leg and to prevent
the need for amputation, surgical removal of dead soft tissue and other repair
to the soft-tissue of the leg, another surgery to remove the external fixator
and insert a hollow tube with screws to stabilize the bones, a second surgery
to remove dead tissue, and skin and muscle grafts using tissue removed from
other places on Jackson’s body.

Dr. Lionberger testified that, at
the time of trial, Jackson was still suffering from lymphedema, or swelling,
that was “uncomfortable” and “painful” and that likely was permanent but could
possibly be improved upon.  He testified
that pain from lymphedema like Jackson’s could “keep somebody awake at night”
and limit mobility.  He also testified
that Jackson would require additional surgeries in the future, including knee
replacement and removal of the rod.  Dr.
Lionberger testified that, in his opinion, Jackson’s injuries causedand the
corrective procedures him pain and suffering, and he will continue to
experience pain “in some form or fashion [for] the remainder of his life.” 

Regarding mental anguish, Jackson’s
mother testified that Jackson “laid in his bed for over a solid year” after the
accident and did not start to “move about” until a month after his last surgery
in April 2010.  She testified that, even
after he appeared to accept that “this is [his] life and [he’s] just going to
have to go on with it,” she still did not “get the sense of him being that
happy in his appearance and how he behaved.” 
She testified that he was “truly depressed” for “one solid year” and that
“[f]riends could come by; no one could entice him to come out of his
room.”  She testified that, even at the
time of trial, Jackson still spent most of his time in his room, elevating his
leg to prevent swelling, and that he could not perform basic chores like
cooking and cleaning.  

Jackson also testified about his
mental state.  He testified that it took
about a month after the incident before he even attempted to be around other
people and that he felt like he was “coming out of [a] tomb.”He testified that
when he tried to get out and do things, his leg swelled and caused pain,
resulting in his retreating back to his room at his parents’ house, and that
this made him “feel bad about [his] life.” 
He testified that it makes him depressed to think about the extent of the
injury and the fact that he will never have a fully-functioning leg again.  He also testified that “it ain’t going to
feel too good” to have his parents, girlfriend, or sons take care of him for
the rest of his life because he can only stand or walk for about an hour before
his leg starts to swell painfully.

Thus, reviewing all the evidence,
we conclude that sufficient, probative evidence exists to support the trial
court’s conclusion that Jackson suffered past physical pain and mental anguish
and that he will suffer physical pain and mental anguish in the future.  Jackson’s own testimony and that of his
mother provided evidence of the nature, duration, and severity of his mental
anguish and established that he experienced a “substantial disruption in his
daily routine.”  See id.  It also established
a probability that he would continue to experience a substantial disruption to
his daily routine in the future.  See Strube, 953 S.W.2d at 857; see alsoTagle, 155 S.W.3d at 519(holding
that mental anguish can be established through testimony from injured party
explaining how he felt and how his life was disrupted).  Furthermore, Jackson’s testimony regarding
his past and current pain and Dr. Lionberger’s description of Jackson’s
extensive and severe injuries and his opinion that it was medically probable
that Jackson would suffer from at least some pain from those injuries for the
rest of his life support the finding of past and future pain.  See Gen.
Motors Corp. v. Burry, 203 S.W.3d 514, 552 (Tex. App.—Fort Worth 2006, pet.
denied) (“Pain and suffering may be inferred or presumed as a consequence of
severe injuries.”).

Given the severe injury, multiple
painful surgeries, and Jackson’s future prognosis, the record does not indicate
that the trial court’s award was against the great weight and preponderance of
the evidence.  See Jackson, 116 S.W.3d at 773; see also Sunbridge Healthcare Corp. v. Penny, 160 S.W.3d 230, 248–52
(Tex. App.—Texarkana 2005, no pet.) (holding that award of one million dollars
was not excessive to compensate plaintiff for physical pain and mental anguish
suffered from injuries sustained in fall); Cresthaven
Nursing Residence v. Freeman, 134 S.W.3d 214, 228–32 (Tex. App.—Amarillo
2003, no pet.) (awarding one million dollars to compensate plaintiff for
physical pain and mental anguish suffered from two broken legs sustained in
fall).

C.      Damages
for Future Medical Expenses

          Marquette
also argues in its third issue that the evidence was insufficient to support
the trial court’s finding of $225,000 for future medical expenses because Dr.
Lionberger admitted that his estimate was a “guess” and because at least one of
the procedures that Lionberger anticipated that Jackson would need in the
future—arthroscopy of the knee—had already been completed at the time of trial.

          We
begin by observing that an award of future medical expenses, like damages for
pain and suffering or mental anguish, lies largely within the fact-finder’s
discretion.  Antonov v. Walters, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005,
pet. denied).  “Because issues such as
life expectancy, medical advances, and the future costs of products and
services are, by their very nature, uncertain, appellate courts are
particularly reluctant to disturb a [fact-finder’s] award of these
damages.”  Id.  No precise evidence is
required to support an award of future medical expenses, and the fact-finder
may base its award on the nature of the injuries, the medical care rendered
before trial, and the condition of the injured party at the time of trial.  Tagle,
155 S.W.3d at 519 (citing City of San Antonio
v. Vela, 762 S.W.2d 314, 320–21 (Tex. App.—San Antonio 1988, writ denied)).

Dr. Lionberger testified that, in
addition to the arthroscopy to repair injuries to knee ligaments and cartilage,
Jackson would likely need a total knee replacement as a result of his injury
and that, because Jackson was forty-six and knee replacements begin to fail
between ten to fifteen years after surgery, Jackson would need more than one
total knee replacement based on reasonable medical probability—potentially
between two and four total knee replacements. 
He also testified that Jackson would need to have the support rod and
screws removed from his leg, but the extent of the surgeries required to do so
depended on how well Jackson’s leg healed. 
If his leg healed well, then doctors could perform two surgeries to
remove the screws and rod and allow his bone to finish healing, but if Jackson
suffered any complications, such as a re-fracture of the weakened bone, then he
would need to have a new rod, new grafts, and eventual removal of the
replacement rod.

Dr. Lionberger’s deposition
testimony, as admitted at trial, established that he believed Jackson would
need approximately $255,000 for future medical expenses as a “rough estimate
being somewhat pessimistic as to the surgeries and the complications that could
befall him.”  At a subsequent deposition,
also admitted at trial, Dr. Lionberger testified that even after the
arthroscopic knee surgery had been completed, he still believed that $225,000
was a good estimate of Jackson’s future expenses.  He testified that Jackson was still not
“totally healed” and that potential complications to the healing process would
be very expensive to treat.  Furthermore,
Dr. Sassard, Marquette’s medical expert, testified that a knee replacement could
cost between $75,000 and $100,000 “[b]y the time you get through all the
expenses and hospital charges and surgeon’s fees and anesthesia and the rehab
and medication. . . .”  

          Dr.
Lionberger was not required to give precise evidence to support the award of
future medical expenses, and he provided extensive evidence regarding the
nature of Jackson’s injuries, the medical care rendered before trial, Jackson’s
condition at the time of trial, and his probable future medical needs.  The trial court was entitled to rely upon
such evidence to support its award.  See Tagle, 155 S.W.3d at 519; see also Weeks Marine, Inc. v. Salinas,
225 S.W.3d 311, 320 (Tex. App.—San Antonio 2007, pet. dism’d) (holding that
“jury is entitled to disbelieve or discount any part of an expert’s testimony”
and to “make credibility determinations and weigh competing expert testimony
and the variables and assumptions upon which that testimony is based”).  Thus, the evidence supports the trial court’s
determination that Jackson would incur additional medical expenses in the
future, and it does not indicate that the trial court abused its discretion in
awarding $225,000 for those damages.  See Antonov,
168 S.W.3d at 908 (holding award for future medical expenses largely within
trial court’s discretion “[b]ecause issues such as life expectancy, medical
advances, and the future costs of products and services are, by their very
nature, uncertain”). 

D.      Damages
for Physical Impairment

          Marquette
argues that the trial court’s finding that Jackson suffered $500,000 in damages
for past physical impairment and $500,000 for future physical impairment was
not supported by the record.

          “Physical
impairment” may encompass the loss of the injured party’s lifestyle, the effect
of which must be substantial and extend beyond any pain, suffering, mental
anguish, lost wages, or diminished earning capacity.  Jackson,
116 S.W.3d at 772.  The loss of enjoyment
of life may be considered as a factor in assessing damages for physical
impairment.  Id.; see also Figueroa v.
Davis, 318 S.W.3d 53, 64 (Tex. App.—Houston [1st Dist.] 2010, no pet.)
(“Physical impairment, sometime called loss of enjoyment of life, encompasses
the loss of the injured party’s former lifestyle.”) (quotingBurry, 203 S.W.3d at 554).  However, a claimant should not be compensated
more than once for the same elements of loss or injury. Jackson, 116 S.W.3d at 770, 772.

          Marquette
argues that there was insufficient evidence of Jackson’s physical impairment
because the “only evidence of any effect on specific non-work related
activities was Jackson’s supposed inability to play recreational sports with
family members.”  Jackson testified that
before his accident he was athletic and liked to play basketball, softball, and
volleyball and to rollerskate with his brothers and his sons.  He also testified that he had been living
with his girlfriend and had been planning to ask her to marry him, but he had
to postpone those plans indefinitely to move in with his parents because he was
no longer able to care for himself following the accident.

          Dr.
Lionberger also testified that Jackson sustained life-long physical
impairment.  He testified that Jackson
had “gait deficiencies” and “rotational abnormalities” that resulted in Jackson’s
walking with a permanent limp; that he did not have full sensation in his left
foot; that he would never be able to run again; that he might dance again, but
“he’s not going to be equal and as agile as he was”; and that he was never
going to be able to move as he had before the accident.  He further testified that Jackson should
probably put a “one-hour limit” on the amount of walking and standing that he
does each day.  As a result, both Jackson
and his mother testified that Jackson was unable to do many common household
tasks, such as cooking and cleaning.

          Thus,
there was sufficient evidence, beyond the loss of earning capacity, of loss of
enjoyment of life, loss of his former lifestyle, and permanent physical
impairment, both in the past and in the future. 
Dr. Lionberger’s and Jackson’s testimony established that Jackson’s
mobility will be permanently limited and that he will no longer be able to
participate in the same activities that he pursued before he was injured,
including everything from standing in order to cook and clean to playing
basketball with his family.Given these facts, we conclude that the trial
court’s award was not contrary to the great weight and preponderance of the
evidence.  See Jackson, 116 S.W.3d at 773;see
also Davis, 318 S.W.3d at 64–65 (upholding award for past and future
physical impairment for plaintiff with dental injuries because he subsequently
had to limit number and types of food he ate and “could not eat some of the
foods that he loved” for several years); Burry,
203 S.W.3d at 545–55 (upholding $3.5 million for future physical impairment for
mother who suffered brain damage and could no longer read to her children,
drive a car, or live without supervision).

E.      Damages
for Disfigurement

          Finally,
Marquette argues in its third issue that the evidence was insufficient to
support the trial court’s findings and award of $500,000 for past disfigurement
and $500,000 for future disfigurement. 
Marquette argues that the evidence of disfigurement was insufficient because
Jackson’s permanent scarring—on his lower left leg, his upper leg, and his side
below his arm—“is on parts of his body that generally will be covered by
clothing.”  

          Disfigurement
is “that which impairs or injures the beauty, symmetry, or appearance of a
person . . . ; that which renders unsightly, misshapen or imperfect, or deforms
in some manner.”  Goldman v. Torres, 341 S.W.2d 154, 160 (Tex. 1960); Pendergraft v. Carrillo, 273 S.W.3d 362,
367 (Tex. App.—Eastland 2008, pet. denied). 
Moreover, the Texarkana Court of Appeals has rejected the argument that
a plaintiff’s scar was not compensable disfigurement because it was small and
covered by clothing.  Wal-Mart Stores, Inc. v. Tinsley, 998
S.W.2d 664, 673 (Tex. App.—Texarkana 1999, pet. denied).  As that court observed, multiple Texas courts
have upheld past and future disfigurement awards for surgical scars.  See id.;
see also Baptist Mem’l Hosp. Sys. v.
Smith, 822 S.W.2d 67, 80 (Tex. App.—San Antonio 1991, writ denied)
(affirming award of $1.5 million for past and future disfigurement where
plaintiff had no scars but did have “contorted limbs” and “facial deformity”), abrogated on other grounds, Sampson v. Baptist Mem’l Hosp. Sys., 940
S.W.2d 128 (Tex. App.—San Antonio 1996); Nw.
Mall, Inc. v. Lubri-Ion Int’l, Inc., 681 S.W.2d 797, 804 (Tex. App.—Houston
[14th Dist.] 1984, writ ref’dn.r.e.) (upholding $55,000 for disfigurement
caused by six surgeries).

          Dr.
Lionberger testified that Jackson’s leg would have permanent scarring and
disfigurement due to the injuries, including the degloving of the skin and soft
tissue around his left leg, and due to the tissue grafts Jackson received.  Jackson also admitted photographs, introduced
during Dr. Lionberger’s testimony, regarding the way Jackson’s leg appeared in
the months following the accident, the effect of taking muscle and skin grafts
from his side and upper leg, and permanent scarring and distention, or
swelling, to his leg.  Jackson also showed
his leg to the trial court at the time of trial.  Thus, the evidence established that Jackson’s
original injury and his subsequent surgeries, including muscle and skin grafts,
impaired “the beauty, symmetry, and appearance of [his] person” and that his leg
was permanently disfigured, scarred, and asymmetrical.  See
Goldman, 341 S.W.2d at 160 (stating that disfigurement is “that which
impairs or injures the beauty, symmetry, or appearance of a person . . . ; that
which renders unsightly, misshapen or imperfect, or deforms in some manner”).  

          We
hold, therefore, that the evidence was sufficient to support the trial court’s
award of damages for past and future disfigurement.  Marquette has not shown that the judgment was
contrary to the overwhelming weight of the evidence, and we will not substitute
our judgment for that of the fact-finder. 
See Jackson, 116 S.W.3d at
773; Ellis, 971 S.W.2d at 406–07.

We overrule Marquette’s third
issue.

Conclusion

We affirm the judgment of the trial
court.

 

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Bland, and Sharp.











[1]           The “eye” refers to a permanent loop
at the end of the mooring line.  The
“cavel” was described as a large cleat along the edge of barge used for
securing lines.





[2]           Marquette does not challenge the
trial court’s findings awarding Jackson damages for lost wages in the past,
lost earning capacity in the future, and past and future loss of household
services.  The damages for these
unchallenged categories totaled $276,090. 
Marquette also paid for Jackson’s past medical expenses.